NORTH CAROLINA
COUNTY OF ORANGE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

CHRISTOPHER J. WRETMAN )
)
Plaintiff, )
)
vs. )
)
THE UNIVERSITY OF NORTH )
CAROLINA SYSTEM, THE )
UNIVERSITY OF NORTH CAROLINA )
AT CHAPEL HILL, THE UNIVERSITY )
OF NORTH CAROLINA BOARD OF )
TRUSTEES, BOARD OF GOVERNORS )
THE UNIVERSITY OF NORTH )
CAROLINA AT CHAPEL HILL, LEE H. )
ROBERTS, in his official capacity, KEVIN )
M. GUSKIEWICZ, individually, JEFFREY )
CAMPBELL, individually and in his )
official capacity, J. CHRISTOPHER )
CLEMENS, individually and in his official )
capacity, RAMONA DENBY-BRINSON )
individually and in her official capacity, )
JEREMY ENLOW, individually and in his )
official capacity, C. ELIZABETH HALL, )
individually and in her official capacity, )
G. MARK HOLMES, individually and in )
his official capacity, DONNA JAMES- )
WHIDBEE, individually and in her official )
capacity, T. ADELE MAYFIELD, )
individually and in her official capacity, )
ANGENETTE MCADOO, individually )
and in her official capacity, LORA )
WICAL, individually and in her )
official capacity, MARGARET BARRETT )
individually and in her official capacity, )
and MIMI V. CHAPMAN individually )
and in her official capacity, )
)
Defendants. )

COMPLAINT
Jury Trial Demanded
(COMP)

FILED 2024 FEB 15 A 11:41 ORANGE CO. C.S.C. BY

1

NOW COMES, the Plaintiff, Christopher John Wretman, by and through their undersigned Attorneys for his claims against Defendants based on his wrongful discharge for a single email sent to a non-member of the University Community, alleges and says as follows:

## PARTIES AND JURISDICTION

1.      Plaintiff, Christopher James Wretman, is a citizen and resident of Orange County, North Carolina.

2.      Defendant the University of North Carolina System (hereinafter the "UNC System") was and is a body politic and corporation capable of being sued pursuant to N.C.G.S. § 116-3 for the actions of its constituent institutions. By statutory directive, the UNC System is "responsible for the general determination, control, supervision, management and governance of all affairs of the constituent institutions" (Id. § 116-11(2)) including, but not limited to, the University of North Carolina at Chapel Hill, East Carolina University, Elizabeth City State University, the University of North Carolina at Charlotte, the University of North Carolina at Asheville, the University of North Carolina at Wilmington, Western Carolina University and Appalachian State University. N.C. Gen. Stat. § 116-2(4).

3.      Defendant, the University of North Carolina (the "University" or "UNC") was and is a public research university operated by the State of North Carolina and is a part of the UNC System and network of facilities of higher education with its principal place of business in Chapel Hill, Orange County, North Carolina. As such, the University is a "constituent institution" of the UNC System. N.C. Gen. Stat. § 116-2(4).

4.      At all relevant times, the Board of Governors of the University of North Carolina has been and is the corporate entity of the University "capable in law to sue and be sued" under N.C. Gen. Stat. § 116-3. At all relevant times, the University of North Carolina

2

Board of Trustees, composed of eight individuals elected by the UNC Board of Governors, four individuals appointed by the North Carolina General Assembly, and the president of the student government, was and is tasked with serving as an advisor to the Board of Governors on matters pertaining to its institution and as advisor to the Chancellor concerning the management and development of the institution.

5.     Upon information and belief, at all times relevant to this Complaint, UNC and the UNC System receives and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Amendments of 1972, 20 U.S.C. §1681(a) (hereinafter "Title IX").

6.     Since on or about January 12, 2024, Defendant Lee H. Roberts (hereinafter "Defendant Roberts") has been and is the Interim Chancellor of the University of North Carolina at Chapel Hill.

7.     At all times relevant times, up and until on or about January 12, 2024, Kevin M. Guskiewicz (hereinafter "Defendant Guskiewicz") served as Chancellor of the University of North Carolina at Chapel Hill.

8.     At all times relevant times, Jeffrey Campbell  (hereinafter "Defendant Campbell") served as served as Head of Infrastructure Management for the University of North Carolina at Chapel Hill.

9.     At all times relevant times, J. Christopher Clemens (hereinafter "Defendant Clemens") served as Provost for the University of North Carolina at Chapel Hill.

10.    At all times relevant times, Ramona Denby-Brinson (hereinafter "Defendant Denby-Brinson") served as Dean of the School of Social Work at the University of North Carolina at Chapel Hill.

3

11.     At all times relevant times, Jeremy Enlow (hereinafter "Defendant Enlow") served as a Senior Investigator for the University of North Carolina at Chapel Hill within the Equal Opportunity and Employment Compliance Office.

12.     At all times relevant times, C. Elizabeth Hall (hereinafter "Defendant Hall") served as Vice Chancellor of the Equal Opportunity and Compliance Office for the University of North Carolina at Chapel Hill.

13.     At all times relevant times, G. Mark Holmes (hereinafter "Defendant Holmes") served as Director of the Cecil G. Sheps Center for the University of North Carolina at Chapel Hill.

14.     At all times relevant times, Donna James-Whidbee (hereinafter "Defendant James-Whidbee") served as a manager within the University of North Carolina at Chapel Hill Employee Management Relations Office Human Resources (OHR).

15.     At all times relevant times, T. Adele Mayfield (hereinafter "Defendant Mayfield") served as a consultant within the University of North Carolina at Chapel Hill Employee Management Relations Office Human Resources (OHR).

16.     At all times relevant times, Angenette McAdoo (hereinafter "Defendant McAdoo") served as a Senior Director within the University of North Carolina at Chapel Hill Employee Management Relations Office Human Resources (OHR).

17.     At all times relevant times, Lora Wical (hereinafter "Defendant Wical") served as Deputy Director and Senior Assistant Dean for Advising for the University of North Carolina at Chapel Hill.

4

18.    At all times relevant times, Margaret Barrett (hereinafter "Defendant Barrett") served as Associate Director for the Carolina Center for Public Service at the University of North Carolina at Chapel Hill.

19.    At all times relevant times, Mimi V. Chapman (hereinafter "Defendant Chapman") served as Associate Dean for Doctoral Education within the School of Social Work at the University of North Carolina at Chapel Hill.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### WRETMAN AT THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL

20.    Dr. Christopher J. Wretman matriculated at the University of North Carolina at Chapel Hill (UNC-CH) as an undergraduate from 1997 to 2001 during which time he completed a double major Bachelor of Arts degree in English Literature and Studio Art with a 3.6 grade point average.

21.    Wretman again matriculated at UNC-CH from 2010 to 2012 during which time he completed a Master of Social Work (MSW) degree at the UNC-CH School of Social Work (SSW).

22.    While pursuing his MSW degree, given his acumen for research, SSW faculty strongly encouraged Wretman to apply to the SSW doctoral program, which he did.

23.    Following his acceptance into the SSW doctoral program in 2012 on a prestigious Doctoral Merit Fellowship, Wretman began a five-year course of study. He successfully defended his dissertation and completed his doctoral degree in summer 2017.

24.    Altogether, Wretman spent 11 years as a student at UNC-CH earning three degrees, and thus became a "Triple Tar Heel." Throughout his time as a student, Wretman was a

5

model student, attaining Dean's List status, graduating with Honors and Distinction, all while completing numerous service duties.

25. Following the completion of his doctoral degree, Wretman began working as a Senior Data Analyst at the Program on Aging, Disability, and Long-Term Care in August of 2017, which is situated in UNC-CH's The Cecil G. Sheps Center for Health Services Research (hereafter "Sheps Center").

26. The Sheps Center Directed is Dr. G. Mark Holmes, who is a faculty member at the UNC-CH Gillings School of Global Public Health.

27. The Program on Aging, Disability, and Long-Term Care is co-led by Dr. Phillip D. Sloane, a faculty member at the School of Medicine, and Dr. Sheryl Zimmerman, who is a faculty member at the SSW.

28. At his hiring, Wretman was designated as permanent Exempt from the North Carolina Human Resources Act (EHRA) Non-Faculty Research Staff.

29. As a Senior Data Analyst, Wretman's Supervisor was Zimmerman. During the entirety of his time at the Sheps Center, Wretman never directly interacted or worked with Holmes.

30. At the Sheps Center, Wretman was funded at 75% "full time equivalent" (FTE). Zimmerman encouraged Wretman to fill his remaining 25% FTE in ways of his own choosing and by seeking additional duties at UNC-CH.

31. To fund himself fully, Wretman sought out work with other UNC-CH faculty on research projects. Also, he taught as an adjunct faculty member at the SSW.

32. For the almost five years while he was at UNC-CH, from 2017–2022, Wretman worked nearly exclusively on research projects, which enabled him to develop considerable

6

expertise in the analysis of health and social services data.

33.     Wretman was an excellent employee with highly positive annual performance evaluations every year he worked at UNC-CH.

34.     By 2022, Wretman had been a co-investigator and/or data analyst on over 20 funded research projects totaling approximately $15,000,000 in funding. Wretman published over 40 peer-reviewed manuscripts and presented over 50 refereed presentations/workshops at academic conferences.

35.     Wretman has dedicated his professional career to conducting research that advances and ensures the health and well-being of vulnerable people, especially children, youth, and older adults, as well as people who are disadvantaged due to economic and social inequities, including victims of human trafficking.

## MACY AND WRETMAN

36.     During his SSW doctoral studies, Wretman became acquainted with Dr. Rebecca J. Macy, an SSW faculty member, through work on research projects.

37.     During a social outing in December of 2015, Macy and Wretman realized that there was a romantic interest in one another.

38.     At the time, Wretman was 37 years of age, and Macy was 46 years of age. Both were single. Wretman had successfully completed all his course work, defended his dissertation proposal, and was working to complete his doctoral dissertation.

39.     Wishing to be fully transparent, as well as wishing to comply with all UNC-CH policies, Macy and Wretman both sought guidance from UNC-CH administrators at the SSW and the Graduate School in January of 2016 about their romantic interest in one another.

Case 1:24-cv-00233-TDS-JLW   Document 1-3   Filed 03/15/24   Page 7 of 82

40.     The collective guidance Macy and Wretman received from administrators was that while Wretman was completing his degree, Macy could not (a) serve on Wretman's dissertation committee, (b) fund Wretman to do any UNC-CH-based work, and (c) serve on any committee that would adjudicate Wretman or consider whether he should get University benefits, primarily student awards.

41.     Following that guidance, which Macy and Wretman did, the SSW and Graduate School administrators gave approval for Macy and Wretman to engage in a romantic relationship at their own discretion.

42.     Macy and Wretman have been romantic partners since 2016 and have owned a home together since fall of 2020.

## THE MACY, RIZO, AND WRETMAN COLLABORATION

43.     Macy is a global expert in the issues of human trafficking, intimate partner violence, and sexual violence with over 20 years of research experience on these topics.

44.     Dr. Cynthia Fraga Rizo, who is an SSW faculty member, is also an expert in the issues of human trafficking, intimate partner violence, sexual violence, with 10 years of research experience on these topics.

45.     Macy and Rizo are long-standing research collaborators who have worked together for over 10 years. Their collaborations begun when Rizo was a doctoral student at the UNC-CH SSW and continued when Rizo joined the SSW faculty in 2014.

46.     Given Wretman's expertise in quantitative data management and analysis, as well as longstanding collegial relationships among the three, Macy, Rizo, and Wretman began collaborating on SSW-based research projects, on an informal basis, in 2019.

8

47.    As a relevant aside, concerning Macy's and Wretman's work together, it is not unusual for intimate partners/spouses who are academics to collaborate with one another. As an example, Sloane and Zimmerman, mentioned above, are both spouses, collaborate on research together, and co-lead the Program on Aging, Disability, and Long-Term Care together.

48.    Beginning in 2018, Dr. Gary L. Bowen, who is presently an emeritus SSW faculty member and was SSW Dean from 2016 to 2021, repeatedly encouraged Macy to collaborate with Rizo to develop a formal research center focused on family and interpersonal violence to be housed in the SSW.

49.    As Dean, Bowen was Macy's Supervisor as he was for all SSW faculty.

50.    As Macy and Rizo developed plans for such a research center, Bowen directed personnel resources to their research and center-development efforts in three keyways. First, Bowen authorized funding at 100% FTE for a postdoctoral scholar. Dr. Jeongsuk Kim, who worked with Macy and Rizo from 2019 to 2022, with Macy as Kim's supervisor. Second, Bowen authorized funding at 25% FTE, for a period of three years, for Wretman to work as a Senior Researcher with Macy and Rizo. Wretman began this work with Macy, Rizo, and Kim in 2019, with Bowen designated as Wretman's "*de facto*" supervisor and "point of contact" at the SSW. Third, Bowen authorized funding at 100% FTE, for a period of three years, for a Research Program Manager. For this role, Ms. Jia Luo began working with Macy, Rizo, Kim, and Wretman in the summer of 2020, with Macy as Luo's Supervisor.

51.    Thus, over about a two-year period, Macy, Rizo, Kim, and Wretman worked together (a) on specific research projects and (b) to develop a formal research center as advised by Bowen, with Luo joining these efforts in the second year.

52.     Although Wretman worked actively with Macy, Rizo, and others at the SSW, 75% of his effort and his primary professional activities remained at the Sheps Center with Zimmerman as his Supervisor, where he worked various faculty, staff, and students, including Ms. Kimberly Ward, who was, at that time, the Director of the Program on Aging, Disability, and Long-Term Care.

53.     Thus, although the Macy, Rizo, Kim, Wretman, and Luo collaboration was in effect a research team, it was an informal one. Likewise, Macy, Rizo, and Wretman worked independently from one another with other faculty on other projects, both inside and outside of UNC-CH. These dynamic and interchanging relationships are typical for university-based researchers.

54.     The informal team also collaborated with other faculty and students at UNC-CH and elsewhere at different points on various research projects, including:

- Ms. Sarah M. Godoy, a Doctoral Student at the UNC-CH SSW who began her doctoral studies in 2020;

- Dr. LB Klein, formerly a Doctoral student at the UNC-CH SSW from 2016 to 2021;

- Ms. Erin Meehan, formerly a MSW student at the UNC-CH SSW from 2020 to 2021;

- Ms. Spenser R. Radtke, a Doctoral Student at the UNC-CH SSW who began her doctoral studies in 2021; and

- Dr. Tonya Van Deinse, a faculty member at the UNC-CH SSW.

55.     In April 2021, Macy presented a formal proposal for an SSW-based research center to Bowen, which was tentatively named the Program for Advancing Violence Research and Education ("PAVRE").

56.     Bowen was highly enthusiastic about the proposal and a formal launch for PAVRE was planned for the fall semester of 2021.

57.     While plans for PAVRE and its formal launch were developing, the world was disrupted by the COVID-19 global health crisis beginning in March of 2020.

58.     Given UNC-CH pandemic mitigation policies, UNC-CH research activities were predominantly accomplished via email, telephone, and virtual technology, mainly via videoconferencing software Zoom.

59.     Consequently, and despite working together for many months, key parties involved in these matters have never met in person. Due to both the COVID-19 policies and EOC investigations, most others have not been in each other's physical presence in more than three years.

60.     Given the detrimental effects of UNC-CH's EOC investigations, as outlined below, PAVRE was never formally launched and no longer exists in any form.

**SCHOOL OF SOCIAL WORK CLIMATE FROM 2020 FORWARD**

61.     In addition to COVID-19 in 2020 and beyond, national social justice movements, including Black Lives Matter, were occurring in the United States.

62.     Like other university schools of social work throughout the United States,[1] the UNC-CH SSW organizational political climate was highly influenced by such national events and movements.

---

[1] Heyward, Giulia, (January 14, 2023). A USC office removes 'field' from its curriculum, citing possible racist connotations. National Public Radio. https://www.npr.org/2023/01/14/1148470571/usc-office-removes-field-from-curriculum-racist; Paul, Pamela (December 7, 2023). What Is Happening at the Columbia School of Social Work? The New York Times. https://www.nytimes.com/2023/12/07/opinion/social-work-columbia-ideology.html

11

63.     On or about June 2, 2020, in response to Black Lives Matter, Dr. Gina Chowa, Dr. Trenette Goings, and Dr. Michael Canute Lambert, who are all faculty at the UNC-CH SSW, along with Dr. Iris Carlton-Laney, who is an emeritus SSW faculty member, issued a "Joint Statement from Black Full Professors" via an SSW-wide email that urged the SSW community to call out every day toxic behaviors and racism.

64.     In their statement, Chowa, Goings, Lambert, and Carlton-Laney alleged that the SSW was blocking opportunities for people of color, ensuring that people of color were kept in their place, and oppressing people of color.

65.     Following this statement, the SSW instituted several new strategies for fighting purported structural racism internally (see then Dean Bowen's June 5, 2020 statement[2]) and uprooting racism in the UNC SSW (see then Dean Bowen's June 19, 2020 statement[3]).

66.     These strategies, which focused inward on the SSW as an organization, both (a) impact school climate and (b) led to the development of several initiatives, including the establishment of a new committee, as well as a speakers' series for the 2020–2021 academic year.

67.     The series was comprised of invited speakers, including Dr. Ibram X. Kendi, who focused on the topics of anti-racism, intersectionality, and social justice.

68.     The speakers' series, among other SSW events, in part, helped to galvanize a call-out-culture at the School, which advocated that faculty, staff, and students address supposed inequalities within the SSW by actively reporting alleged discrimination and other injustices, as well as actively encouraging SSW staff to confront alleged perpetrators of wrongdoing.

---

[2] https://ssw.unc.edu/recommitment-to-social-justice-letter/
[3] https://ssw.unc.edu/anti-racism-task-force-letter/

12

69.     For example, in his October 2020 talk for the UNC-CH SSW, Kendi, who is widely known for his controversial anti-racist philosophies, exhorted the SSW Community as follows: "When something is the status quo, when you do nothing—the status quo continues, and you are complicit in the continuance of that status quo."[4]

70.     Along these lines, the SSW established a now defunct Racial Reconciliation Committee, whose charges included creating a forum where faculty, staff, and students could raise concerns of discrimination. The committee's formal charge also included working with the Dean to address perpetrators of discrimination and to issue disciplinary actions against alleged perpetrators.

71.     This committee seemingly had no written policies, procedures, nor any due process protections for those accused of so-called injustices.

72.     The committee was ended about two years after its launch.

73.     In its two years of operation, Chowa, Goings, and Lambert served as members of the Racial Reconciliation Committee, along with Dr. Mimi V. Chapman, who is a faculty member at the SSW. Dr. Kirsten Kainz, formerly a faculty member at the SSW, also served on the Racial Reconciliation Committee for a time.

74.     No matter how well intended, the Racial Reconciliation Committee, gave SSW faculty, staff, and students a formalized venue to "call out" one another for contentions of abuse, discrimination, harassment, harms, sexism, and racism, even when such allegations may have been entirely without evidence or merit or even when they were made in bad faith.

---

[4] https://ssw.unc.edu/2020/11/highlights-from-ibram-x-kendis-presentation/

## TITLE IX AND EOC REPORTS: APRIL TO NOVEMBER 2021

75.     The UNC-CH Equal Opportunity and Compliance Office (EOC) is the sole formal entity at UNC-CH charged with investigating Reports of Discrimination and Harassment under its policies, which include the Policy Prohibiting Discrimination, Harassment, and Related Misconduct (hereafter PPDHRM).

76.     When Reports of Bullying are alleged and when such Reports are based on age, color, disability, gender, gender expression, gender identity, genetic information, national origin, race, religion, sex, sexual orientation, or veteran status, per UNC-CH policy, these are also addressed by EOC.

77.     If a Report of Retaliation emerges during EOC actions and matters, EOC investigates such reports under its PPDHRM as well.

78.     In addition, the EOC has specific Procedures policies for different roles at UNC-CH. Accordingly, Wretman's EOC matters were carried out using EOC's "Procedures for Reporting and Responding to Complaints of Discrimination, Harassment, and Related Misconduct Involving a University Employee as the Responding Party" (hereafter the "PPDHRM Procedures").

## GODOY REPORTS: APRIL and MAY 2021

79.     In August 2020, Godoy began her first year in the SSW doctoral program as a student.

80.     Because of her interest in pursuing research focused on anti-human trafficking, Godoy's faculty adviser and research mentor was Rizo, who is an expert in this area with ongoing research projects.

14

81.     During the 2020–2021 academic year, Godoy worked with Rizo and Macy on research projects with faculty and students in the Gillings School of Global Public Health, as well as with Rizo, Macy, Kim, Luo, Wretman and other faculty and students in the SSW. These diverse and dynamic working relationships are common social work researchers, including doctoral students.

82.     On or about April 1, 2021, Godoy met with Chapman, who is the SSW Associate Dean for Doctoral Education, and another faculty member for a year-end review meeting. Upon information and belief, the other SSW faculty member at the meeting was Kainz. In the meeting, Godoy expressed concerns about communication with her informal research team, led by Macy, Rizo, and Wretman.

83.     Following that initial discussion, Chapman initiated follow-up conversations with Godoy, as well as with Rizo and Zimmerman and possibly others at UNC-CH, about Godoy's concerns in the weeks following.

84.     At least some of these conversations initiated by Chapman contradicted the University's PPDHRM Procedures, which direct a UNC-CH Administrator Supervisor or a Responsible Employee, which Chapman was in her role leading the SSW doctoral program, to contact EOC/Title IX as soon as possible and to not attempt to resolve the report or address the matter without consultation with and assessment from EOC/Title IX.

85.     After these conversations, Chapman made a Report to the EOC/Title IX Office. The content and form of Chapman's report remain unknown. If and how the report was Assessed by the EOC/Title IX Office also remain unknown.

86.     However, the Report was Assessed, on or about May 6, 2021, Chapman sent an email calendar invitation to Macy, Rizo, and Wretman with the following message, on which Ms. Adrienne Allison, who was UNC-CH Director of Title IX Compliance at the time, was copied: "Dear Rebecca, Cindy, and Chris—Please prioritize this meeting with myself and Adrienne Allison of the EOC office. With thanks, Mimi."

87.     This calendar email was the first indication to Macy and Wretman that Godoy had any concerns. Heretofore, neither Godoy nor Rizo had ever indicated in any way that Godoy had concerns with the team or with Wretman. Also, as contemporaneous emails show, Macy's and Wretman's communications and interactions with Godoy had been constructive and positive throughout their work together.

88.     After receiving the calendar invitation, Macy communicated with Allison and Chapman asking for the meeting's agenda and purpose.

89.     Next, Chapman communicated by email that there were to be two meetings, instead of the one, but did not offer any explanation for the change, nor did she offer any agendas.

90.     Per Chapman's communication, one meeting was to be held with Chapman, Rizo, and Macy. The other meeting is to be held with Allison and Wretman. Given the revised structure of the meetings, Wretman had seemingly been the focus of the Godoy/Chapman report to EOC/Title IX.

91.     Next, Wretman emailed Allison requesting additional information about their meeting as the meeting did not seem to be connected to any sort of Title IX policy stipulation or process.

92.     Allison replied with a statement that Wretman's refusal to participate in a conversation may lead her to involve Social Work and/or Sheps Center leadership in a way that she had not anticipated at that time, which pressured Wretman with an escalation of EOC/Title IX actions and adverse professional consequences if he did not attend the meeting with Allison.

93.     Thus, Wretman felt compelled to attend a meeting to which he did not wish to attend.

94.     The two meetings were subsequently held via Zoom. Chapman, Macy, and Rizo met on or about May 10, 2021, while Allison and Wretman met on or about May 13, 2021.

95.     In their meeting, Chapman related to Macy and Rizo that Godoy reported that the team dynamics, particularly the team's close relationships, made her uncomfortable. Godoy alleged that Wretman made inappropriate comments. Godoy also declared to Chapman that it was not healthy for her to spend time in the team's meetings.

96.     Chapman did not ask for Macy's and Rizo's perspectives on Godoy's allegations and complaints. Rather, Chapman herself declared that she felt concern about Godoy's contentions, describing them potentially indicative of harassment, without presenting any evidence or explanation of such.

97.     Chapman stated EOC wanted to have a conversation with Wretman, and that she did not wish to characterize that conversation. Chapman, while acknowledging that Wretman was the lead on the team's statistical research, declared that ideally Wretman would not be involved further with Godoy's work. Thus, Chapman asked Macy and Rizo to restructure Godoy's research assistantship. Chapman also declared that she needed to create a memorandum about Godoy's first-year meeting and its resolution for keeping in undetermined SSW doctoral program files.

17

98.     The detailed information Chapman shared in the meeting with Macy and Rizo about Godoy's concerns with Wretman violated the University's PPDHRM Procedures which declare the importance of safeguarding the privacy of the individuals involved in a manner consistent with applicable law and University policy, both in terms of Chapman's knowledge of Wretman's matters, as well as the information Chapman shared with Macy and Rizo about Wretman and Godoy.

99.     Chapman's plans to develop a document detailing these EOC/Title IX matters for SSW files also violated the University's confidentiality policies.

100.    For Wretman's meeting, Alison invited Mr. Eric Quimbaya-Winship, then Deputy Title IX Coordinator and Report and Response Coordinator, to attend. Rizo also attended the meeting at Wretman's behest as Wretman's support person.

101.    Despite being labeled in a pre-meeting email as an educational conversation and not a disciplinary conversation, Allison informed Wretman that, based on Godoy's reports, he had behaved poorly. The meeting was tense and conflictual. Allison was emphatic in stating that there was problem in Wretman's conduct, despite no evidence or investigation having been done. Quimbaya-Winship explicated that Wretman needed to comport himself more appropriately as a straight White male.

102.    At the completion of the meeting Allison informed Wretman that the EOC/Title IX matters relating to Godoy were resolved as far as the University was concerned.

103.    Contrary to the PPDHRM Procedures, at no point in the meeting did Allison provide Wretman with information about EOC/Title IX processes or any guidance on preventing Retaliation.

104.    Per the PPDHRM Procedures, EOC is required, if a Report becomes known to a Responding Party to provide the Responding Party with the available range of Interim Measures, an explanation of the procedural options, including Informal Resolution and Investigation, and the Policy's prohibition on Retaliation. By not addressing these topics with Wretman, Allison and Quimbaya-Winship both violated the PPDHRM policy and left Wretman without the supports and resources he was due per policy.

105.    In addition, in both meetings, Allison and Chapman relayed that Godoy was concerned with the team communication and team dynamics. Nonetheless, Wretman, who was the only male on the team was the key focus in both discussions. Wretman was also the only member of the team required to attend a formal meeting with the Title IX Office.

106.    Despite being shocked and distressed by the content and tone of both meetings, Macy and Wretman subsequently offered to Rizo to step off research projects on which Godoy was working to help resolve matters as amicably as possible.

107.    Also following the meetings, sometime throughout May 2021, upon information and belief, discussions were held among sub-groupings of Bowen, Chapman, Godoy, and Rizo about Godoy's concerns and Rizo's supervision of Godoy.

108.    Thereafter, sometime on or about mid-May 2021, Godoy decided to leave Rizo's supervision entirely, as well as the research team.

109.    With input from Wretman, Macy and Rizo developed a plan to enable Godoy to complete all research projects that she had begun with Macy, Rizo, and Wretman in the prior academic year, which would ensure that Godoy could retain her role as an author/co-author on all papers and presentations going forward.

110.     Via email, Godoy indicated to Rizo that the plan was agreeable to her. Accordingly, over the summer and fall semesters, Macy, Rizo, and Wretman followed the plan, communicated with Godoy by email, and worked to complete projects and papers with Godoy, as possible.

## LUO REPORTS JUNE 2021

111.     In August 2021, Luo began working as a Research Program Manager at the SSW with Macy as her Supervisor.

112.     For the next 10 months, throughout May 2022, Luo worked with Macy, Rizo, Kim, Wretman and other SSW faculty and students on various research projects, as well as helping to develop plans for PAVRE.

113.     Throughout this time, Macy held regular supervision meetings with Luo. As is her typical supervision style, Macy regularly invited Luo to provide feedback to her as a Supervisor, including offering to adjust her role, supports, and work activities if needed. At no point during these ten months did Luo ever raise concerns to Macy about herself, Rizo, or Wretman, or about how the team communicated and functioned.

114.     Also, as contemporaneous emails show, Macy's and Wretman's communications and interactions with Luo had been constructive and positive throughout their work together.

115.     Sometime in late May 2021, Godoy and Luo had dinner together. Upon information and belief, Godoy reported to Luo her experiences with EOC/Title IX, while also falsely reporting to Luo that Macy, Rizo, and Wretman actively and intentionally removed Godoy from the PAVRE research team.

116.     On or about June 3, 2021, and sometime within about a week of having dinner with Godoy, Luo met with Macy to raise concerns about the research team and its functioning.

Case 1:24-cv-00233-TDS-JLW   Document 1-3   Filed 03/15/24   Page 20 of 82

117. In the meeting, despite offering scant detail and specifics, Luo, who is Asian American, made allegations against the team and Wretman concerning anti-Asian hate, harassment, and a toxic work environment. Luo declared that Wretman's communication style was particularly a problem for her. Following from her conversation with Godoy, Luo indicated that Macy and Rizo had lied to protect Wretman over Godoy in their responses to Godoy's EOC/Title IX matters.

118. Luo also indicated to Macy that she knew of others with concerns about Wretman, although she did not elaborate to Macy about who had these concerns, what the concerns were, or how she had come to learn about the concerns.

119. Macy listened to Luo's allegations, as well as invited Luo to suggest solutions. Among a few suggestions, Luo indicated that she wanted the team to change the ways that they deliver feedback to one another. Luo also indicated that she did not necessarily want to go to UNC-CH Human Resources with her concerns but that she might do so. Luo indicated broadly that she wanted Macy to do something to resolve matters but was not specific in what she wanted Macy to do.

120. Before concluding the meeting, Macy indicated to Luo that she would need to consult with others before taking any actions, as well as encouraged Luo to do the same, including to consult with or make a report to EOC herself if she wanted to do so.

121. On or about June 4, 2021, following consultation with Bowen as the SSW Dean at that time and given her role as a Responsible Employee, Macy reported Luo's concerns about herself, Rizo, and Wretman to EOC via EOC's online portal.

122.     Immediately after making the report, Macy spoke with Luo by telephone to let her know that because of the University's Responsible Employee policy, and given Bowen's guidance, Macy had made a report of Luo's concerns to EOC and that EOC should be reaching out to Luo soon.

123.     Given that both Macy and Wretman were working at home due to UNC-CH COVID-19 mitigation policies, Wretman was aware of the discussions Macy was having in early June 2021, as well of the fact that Macy made a report to EOC.

124.     Macy briefly told Wretman that Luo was raising concerns as well as generally indicated to him that others may have concerns too, in case Wretman wanted to step back from SSW work activities to establish safeguards for himself.

125.     Wretman was exceedingly distressed by having additional, unfounded allegations leveled against him, especially when no team members had ever raised concerns about him prior.

126.     Being mindful of a potential EOC investigation, Macy did not share any specific information with Wretman about Luo's concerns, Macy's discussion with Bowen, or the report Macy had made to EOC.

127.     After making the EOC report, in early June 2021, Macy sought and received guidance from UNC-CH administrators about how to manage working relationships while EOC Assessments of her report and Luo's concerns were made.

128.     Macy consulted with Bowen, Mr. Linc Butler, who is an Associate Vice Chancellor for Human Resources, Ms. C. Elizabeth Hall, who is the Associate Vice Chancellor of Equal Opportunity and Compliance at EOC, and Ms. Kara Simmons, who is the Associate Vice Chancellor and Senior University Counsel in the Office of University Counsel (OUC).

129.     Altogether, the guidance Macy received was to work as typically as possible, but not to discuss the EOC matters with anyone, particularly any accounts or details that may be a focus of a future EOC Investigation.

130.     Hall also strongly cautioned Macy to not do anything that might bring the Assessment of Luo's report to premature closure.

131.     Macy relayed this guidance to Rizo and Wretman, while also encouraging both to contact EOC and OUC as well if they so wished.

132.     Also in early June, as Luo's Supervisor, Macy worked with Bowen, Human Resources, and Luo to adjust Luo's working arrangements while the EOC Assessment was ongoing.

133.     Macy connected Luo to Bowen so that she could have supervision support as needed and if she did not feel comfortable reaching out to Macy. Macy also offered for Luo to have time out of office to participate in EOC processes as well as to seek emotional and other support.

134.     Luo also requested from Macy, via email, permission to work remotely while the EOC Assessment was ongoing because she claimed, without evidence, that Wretman would retaliate and/or take revenge against her verbally or physically. Luo also claimed, without evidence, that she was undergoing heightened psychological distress and racial trauma due to anti-Asian violence.

23

135.   Macy was gobsmacked by these baseless claims. Nonetheless, out of fear of escalating what had become an adversarial matter with Luo, as well as out of fear of being condemned by EOC and SSW administrators for not centering the wishes of a Reporting Party, Macy sought the approval as Luo requested. Consequently, Luo was allowed to work completely remotely.

## MEEHAN REPORT: NOVEMBER 2021

136.   In 2020, Meehan enrolled in the UNC-CH SSW's MSW program as a student.

137.   Because of her interest in pursuing a career in social work evaluation/research, along with her interest intimate partner violence prevention, Meehan sought a field placement internship with Macy. Macy agreed to create and be Meehan's Supervisor for such an internship, for which she would earn academic credit toward her MSW degree.

138.   During the 2020–2021 academic year, Meehan worked with Macy, Rizo, Kim, Wretman, Luo, and other UNC-CH faculty and students on various research projects, as well as helping to develop plans for PAVRE.

139.   Throughout Meehan's internship, Macy held regular supervision meetings with Meehan. As is her typical supervision style, Macy regularly invited Meehan to provide feedback to her as a Supervisor, including offering to adjust her role, supports, and work activities if needed. At no point during the internship did Meehan ever raise concerns to Macy about herself, Rizo, or Wretman, or how the team communicated and functioned.

140.   Also, as contemporaneous emails show, both Macy's and Wretman's communications and interactions with Meehan had been constructive and positive throughout their work together.

141.    Meehan's internship with Macy ran from August 2020 to May 2021. On or about May 8, 2021, Meehan completed all her MSW coursework and her degree at UNC-CH. Meehan started as an employee at the non-profit organization Prevent Child Abuse North Carolina thereafter. Macy, Rizo, and Wretman all provided references for Meehan for this employment.

142.    On or about June 4, 2021, after realizing that he may soon be facing a second round of adverse professional actions from EOC/Title IX and the SSW based on additional allegations that were without merit, beset with feelings of anxiety, dread, and vulnerability, Wretman sent an email to Meehan with the subject line "Rescinding Offer of Help."

143.    The email in its entirety stated, "I am writing to formally rescind any offer I have made to help you at PCANC [Prevent Child Abuse North Carolina], offer you a job reference, help you apply to a PhD program, help you with any written work, or to help you in any other manner. Please do not contact me going forwards."

144.    Wretman's intent with the email was to limit his professional interactions with members of the SSW community, and if possible, to protect himself from further professional and reputational damage.

145.    Wretman emailed Meehan because she was no longer enrolled in UNC-CH, thus, he had no professional obligation to work with her in any capacity, particularly because he had never had a formal role vis-à-vis Meehan as an instructor or supervisor.

146.    Following from Wretman's June 2021 email, according to EOC Investigation Reports, Meehan became a Reporting Party on or about November 11, 2021. The specific content and form of Meehan's report remains unknown.

147. Notably, about 160 days passed from the time that Wretman sent his June 2021 email to the time that Meehan became a reporting party in November 2021.

148. In the interim, following the guidance that Macy had received from UNC-CH administrators to work as typically as possible, Macy emailed Meehan about a potential research idea that emerged toward the end of Meehan's internship in spring 2021.

149. Specifically, Macy and Meehan had discussed the possibility of developing one of Meehan's course assignments into a manuscript for submission to a scientific journal. In response to Macy's communication, Meehan agreed to the idea, which included working with Wretman.

150. Thus, Meehan, Macy, Rizo, who was the lead on the data from which Meehan's assignment was developed, and Wretman, who has supported Meehan with the statistical analyses during her coursework, began working to turn Meehan's assignment into a publishable manuscript.

151. This work continued throughout 2021 and 2022 and resulted in a paper published in the *Journal of Society for Social Work and Research*, titled "The Relationship Between Employing Latinx Staff and Domestic Violence Service Provision: A Brief Research Report," on which Meehan is the first author.

152. Wretman's statistical work made the advancement of Meehan's research and the paper possible. Overall, he accrued approximately 20 hours following June 2021 conducting statistical analyses and writing on the paper.

153. During the entirety of the time collaborating on the paper, as contemporaneous emails show, all communications and interactions among Meehan, Macy, Rizo, Wretman, and others involved in the paper, were constructive and positive.

## ASSESSMENTS: APRIL 2021 to MARCH 2022

154.    As part of any EOC process concerning Reports of Harassment and Retaliation, the PPDHRM Procedures require EOC to conduct an Initial Assessment of such Reports to determine whether the alleged conduct would present a violation of the Policy and whether further action is warranted based on the alleged conduct.

## ASSESMENT OF LUO'S REPORTS: JUNE to NOVEMBER 2021

155.    While Macy made report of Luo's concerns in early June 2021, Wretman did not receive his EOC Notice of Investigation (NOI) until on or about November 23, 2021, indicating that EOC's Assessment of the Luo/Macy report lasted over 170 days.

156.    How and when EOC performed an Assessment of Luo's allegations remains unknown, particularly given that Macy made the Report and given that no one from EOC follow-up with Macy about her Report.

157.    No documentation or information detailing a rationale that Luo provided sufficient allegations or evidence of a University policy violation to warrant an Investigation of Wretman have ever been provided.

158.    Although much is unknown of EOC's activities during this five-month period, what is known is that Luo was undertaking actions relevant to EOC matters.

159.    On August 19, 2021, Luo asked to meet with Macy. In their meeting, Luo conveyed to Macy that she would like to have her position changed so that Van Deinse would be her primary supervisor at the SSW.

160.    Macy then worked with Luo, Van Deinse, and SSW Human Resources to enact this transfer, which officially occurred on or about September 1, 2021.

27

161. Van Deinse would later become a witness in Wretman's EOC investigation.

162. Shortly thereafter, in early September 2021, Luo met with the SSW's Racial Reconciliation Committee.

163. Chapman, who was actively involved with Godoy's concerns in spring 2021, and who later became a witness in the EOC Investigations of Wretman, attended this meeting.

164. At the meeting, Luo seemingly discussed with the committee how Macy, Rizo, and Wretman were engaging in emotional abuse, upholding white supremacy, and gaslighting. Luo also seemingly shared emails from her work with Macy, Rizo, and Wretman with the Committee, as well as the email that Wretman sent to Meehan in June 2021.

165. During the meeting, SSW committee members—with Luo present—discussed contacting the new SSW Dean, Dr. Ramona Denby-Brinson, with Luo allegations because Committee members purportedly had other information that was relevant to Luo's reports.

166. Luo felt her alleged concerns were highly validated by the Committee, which in turn, led to her, at least in part, to move forward with an EOC Investigation of Wretman.

167. Upon information and belief, around the same time, Luo contacted Kim at least on one occasion to invite her into EOC actions against Wretman. Kim declined to do so concerned that Luo seemed obsessive about EOC matters as well as concerned for Luo's mental health. Kim encouraged Luo to communicate with Macy and Wretman to resolve matters. In response, Luo—without evidence—alleged to Kim that Wretman would physically harm Luo if she met with him.

168. Concerning Luo's meeting with the SSW Racial Reconciliation Committee, the detailed information Luo shared in the meeting about Wretman as well as others violated the UNC-CH's PPDHRM Procedures that declare the importance of safeguarding the privacy of the individuals involved in EOC matters. The Racial Reconciliation Committee's plans to

communicate to Denby-Brinson Luo's allegations likewise violated the UNC-CH's confidentiality policies.

169.     Contrary to EOC's Investigation Guidance, which asks Investigation participants not discuss the details of their accounts with witnesses, Luo's discussions with the Racial Reconciliation Committee were influencing of Chapman, who discussed the content of the Committee's meeting with Luo in her future Investigation interview.

170.     Luo held her EOC interview on or about October 22, 2021, which was about 140 days after the first report of her concerns. The interview was led by Mr. Jeremy Enlow, who is a Senior Investigator in EOC. Mr. Carwin Liang-Ratliff, who is formerly a Senior Human Resources Consultant in the UNC-CH OHR, was also present as an Investigator.

171.     In her interview, Luo shared Meehan's email with the Investigators. She also indicated, several times throughout the interview, that she had spoken to her witnesses considerably about her allegations and reports, thereby going beyond what is allowable under EOC policies for Reporting Parties.

172.     Luo also repeatedly directed the Investigators to speak to her witnesses about specific issues concerning Wretman, indicating that Luo had knowledge of what her witnesses would declare to EOC Investigators, thereby going beyond what is allowable under EOC policies for Reporting Parties.

173.     Although Luo held her EOC Interview on or about October 22, 2021, Wretman did not receive an NOI based on Luo's reports until on or about November 23, 2021, about 20 working days later, which contrasts with EOC policies stipulating that EOC will provide Responding Parties written notice of investigations typically within five working days.

29

174.    Notably, Wretman's NOI stemming from Luo's allegations contained several violations of UNC-CH policies.

175.    Based on Luo's allegations, EOC elected to Investigate Wretman for possible violations of UNC-CH's Hostile Environment Harassment. The University's PPDHRM defines Hostile Environment Harassment as "Unwelcome conduct based on Protected Status that is so severe, persistent, or pervasive that it alters the conditions of education, employment, or participation in a University program or activity, thereby creating an environment that a reasonable person in similar circumstances and with similar identities would find hostile, intimidating, or abusive."

176.    As its insubstantial justification for a Hostile Environment Harassment Investigation of Wretman, EOC delineated that Luo had alleged that Wretman had, as examples, engaged in unwarranted criticism of Luo's work products, been overly critical of her in meetings, and had been passive aggressive. EOC also noted as justification Luo's feelings that Wretman had been intimidating, condescending, and/or aggressive without providing any indicators of such.

177.    EOC's NOI provided no specifics as to how Luo's allegations met a standard of being hostile, intimidating, or abusive. Moreover, the NOI only noted that Luo's alleged that Wretman's conduct was unwelcome, while not addressing how it was severe, persistent, or pervasive.

178.    Accordingly, EOC did not make a case for launching an Investigation of Hostile Environment Harassment of Wretman in their NOI because, even if Luo's reports had been true, it is not clear that they presented a violation of the policy, particularly one that was based on Protected Status.

179. Based on Luo's allegations, EOC also elected to Investigate Wretman for possible violations of the University's Bullying policy under its Workplace Violence Policy (WVP). The WVP defines bullying as "unwanted offensive and malicious behavior that undermines an individual or group through persistently negative attacks. The behavior generally includes an element of vindictiveness and is intended to undermine, patronize, humiliate, intimidate, or demean the recipient. The behavior typically is severe, pervasive, or persistent, creating a hostile work environment."

180. Again, to justify a Bullying Investigation of Wretman, EOC insubstantially delineated that Luo had alleged that Wretman had, as examples, engaged in unwarranted criticism of Luo's work products, been overly critical of her in meetings, and had been passive aggressive. EOC also noted as justification Luo's feelings that Wretman had been intimidating, condescending, and/or aggressive without providing any indicators of such.

181. Thus again, EOC's NOI provided no specifics as to how Luo's allegations met a standard of being vindictive or intended to undermine, patronize, humiliate, intimidate Luo. Moreover, the NOI did not address how such conduct, even if it were true, was severe, pervasive, or persistent. Accordingly, EOC did not even make a case for launching a Bullying Investigation of Wretman in their NOI because, even if Luo's reports had been true, it is not clear that they presented a violation of the policy.

182. In addition, Luo's reports to Macy indicated that she was concerned overall with the team's communication and dynamics, including Macy and Rizo, as well as Wretman.

183. However, Wretman, who was the only male on the team, was the only one investigated for Bullying and Harassment indicating that EOC discriminated against Wretman based on his sex, which is a Protected Status, by launching Investigations against him solely in the

first place, which in turn, was a detriment that unreasonably interfered with Wretman's access to employment, as well as the conditions and benefits of his employment.

## ASSESMENT OF MEEHAN REPORT: DECEMBER 2021

184.    According to Wretman's EOC Investigation Report, Meehan became a Reporting Party on or about November 11, 2021, which was also the same day that she participated in her sole Investigation interview with EOC. This was also about 160 days after Wretman sent the email that was the focus of Meehan's report.

185.    How and when EOC performed an Assessment of Meehan's allegations remains unclear, particularly given that Meehan made her Report and participated in her Investigation interview on the same day.

186.    Likewise, no documentation or information detailing a rationale that Meehan provided sufficient allegations or evidence of a University policy violation to warrant an investigation of Wretman have ever been provided.

187.    Meehan's Investigation interview was led by Enlow. Liang-Ratliff was also present as an Investigator.

188.    Although Meehan held her EOC Interview on or about November 11, 2021, Wretman did not receive an updated NOI based on Meehan's reports until on or about December 13, 2021, which is about 20 working days later and contrasts with EOC policies stipulating that EOC will provide Responding Parties written notice of investigations typically within five working days.

189.    Based on Meehan's allegations, EOC elected to Investigate Wretman for possible violations of UNC-CH's PPDHRM Retaliation Policy.

32

190.    Under PPDHRM, "Retaliation is any adverse action or attempted action that would discourage a reasonable person from engaging in protected activity. Protected activity includes an individual's actual or perceived: (i) participation in the reporting, investigation, or resolution of an alleged violation of this Policy; (ii) opposition to policies, practices, or actions that the individual reasonably believes are in violation of the Policy; or (iii) requests for accommodations on the basis of religion, pregnancy or related medical conditions, or disability."

191.    Wretman's updated NOI declared that Meehan had alleged that Wretman had retaliated against her for participating in the reporting and/or opposition to Wretman's actions that Meehan believed were in violation of the Policy without providing any indicators of such.

192.    Accordingly, EOC did not even make a case for launching a Retaliation Investigation of Wretman in their NOI because there was no evidence or indicators that Wretman had emailed Meehan because he perceived her to be supporting Luo's concerns, which Luo reported to Macy.

**ASSESMENT OF GODOY'S REPORT: APRIL 2021 to MARCH 2022**

193.    While Chapman made an EOC/Title IX report of Godoy's concerns sometime in late April 2021, Wretman did not receive his EOC Notice of Investigation until on or about March 9, 2022, indicating that EOC's Assessment of the Godoy/Chapman report lasted well over 300 days.

194.    Relatedly, Godoy held her first EOC interview about her concerns with Wretman, which seemingly would have been part of EOC's Assessment, on or about December 20, 2021, which was about 260 days after her first report of concerns made in early April 2021.

195.    Godoy's interview was led by Enlow. Ms. Donna James-Whidbee, Manager in UNC-CH Employee and Management Relations, was also present as an Investigator.

196.    Although Godoy held her EOC Interview on or about December 20, 2021, Wretman did not receive an updated NOI based on Godoy's reports until on or about March 9, 2022, which is about 50 working days later and markedly contrasts with EOC policies stipulating that EOC will provide Responding Parties written notice of investigations typically within five working days.

197.    How and when EOC performed an Assessment of Godoy's allegations remains unknown, particularly given that, in May 2021, Allison declared to Wretman that EOC/Title IX matters relating to Godoy were resolved as far as the University was concerned.

198.    Likewise, no documentation or information detailing a rationale that Godoy provided sufficient allegations or evidence of a University policy violation to warrant an investigation of Wretman have ever been provided.

199.    Nonetheless, during this time, upon information and belief, Godoy was reaching out to other doctoral students concerning her allegation about the Macy, Rizo, and Wretman team.

200.    Also, gossip and speculation concerning Wretman's EOC matters was being actively shared among SSW doctoral students as well as SSW faculty who were working with these doctoral students.

201.    The gossip and speculation concerning Wretman was so pronounced that hearsay manifested in formal SSW communications and meetings, particularly in the weeks directly before Wretman's NOI was updated to include Godoy's reports.

202.    On information and belief, Wretman's confidential EOC matters were discussed in an SSW doctoral program committee meeting led by Chapman on or about February 24, 2022, as well as in a meeting that Denby-Brinson held with SSW doctoral students on or about March 1,

34

2022.

203.    Relatedly, on or about March 3, 2022, Denby-Brinson sent an email to all the SSW faculty admonishing faculty from having side conversations and from sharing of hearsay/rumor with students and with each other about personnel matters. Over 50 faculty would likely have received this email. In this same email, Denby-Brinson cautioned faculty from having convenings of students. She went onto declare that personnel matters should not be discussed with students at all and that faculty as well as doctoral students should avoid unnecessary entanglement in UNC-CH Human Resources issues.

204.    On or around March 9, 2022, EOC updated Wretman's NOI to add additional allegations concerning Bullying and Harassment based on Godoy's Reports. Notably, Wretman's updated NOI also contained several violations of UNC-CH policies.

205.    Based on Godoy's allegations, EOC elected to Investigate Wretman for possible violations of UNC-CH's Hostile Environment Harassment.

206.    As its insubstantial justification for a Hostile Environment Harassment Investigation of Wretman, EOC delineated that Godoy had alleged that Wretman had, as examples, offered to take Godoy out for drinks with Macy and had made comments on Godoy's appearance, specifically her height.

207.    EOC's NOI provided no specifics as to how Godoy's allegations met a standard of being hostile, intimidating, or abusive. Moreover, the NOI only noted that Godoy's alleged that Wretman's conduct was unwelcome, while not addressing how it was severe, persistent, or pervasive.

208.    Accordingly, EOC did not make a case for launching an Investigation of Hostile Environment Harassment of Wretman in their updated NOI because, even if Godoy's reports had been true, it is not clear that they presented a violation of the policy, particularly one that was based on Protected Status.

209.    Based on Godoy's allegations, EOC also elected to Investigate Wretman for possible violations of the University's Bullying policy under its WVP.

210.    Again, to justify a Bullying Investigation of Wretman, EOC insubstantially delineated that Godoy had alleged that Wretman had, as examples, offered to take Godoy out for drinks with Macy, made comments on Godoy's appearance (i.e., her height), made workplace decisions with Macy but without input from the rest of the research team, and had assumed a leadership role on the research team, without providing any indicators of such.

211.    Thus again, EOC's NOI provided no specifics as to how Godoy's allegations met a standard of being vindictive or intended to undermine, patronize, humiliate, or intimidate Godoy. Moreover, the NOI did not address how such conduct, even if it were true, was severe, pervasive, or persistent.

212.    Accordingly, EOC did not even make a case for launching a Bullying Investigation of Wretman in their updated NOI because, even if Godoy's reports had been true, it is not clear that they presented a violation of the policy.

213.    In addition, Godoy's reports to Chapman and others indicated that she was concerned overall with the team's communication and dynamics, including Macy and Rizo, as well as Wretman. However, Wretman, who was the only male on the team, was the only one investigated for Bullying and Harassment indicating that EOC discriminated against Wretman based on his sex, which is a Protected Status, by launching Investigations against him solely in the

first place, which in turn, was a detriment that unreasonably interfered with Wretman's access to employment, as well as the conditions and benefits of his employment.

## INVESTIGATIONS: NOVEMBER 2021 to MAY 2022

214.    EOC's formal Investigations of Wretman, which were largely conducted by Enlow and James-Whidbee, began with the delivery of an NOI to Wretman in November 2021 and lasted until the delivery of EOC's the Investigation findings in May 2022 to Wretman via an email from Hall.

215.    Thus, the Investigation lasted over 110 workdays, which was in violation of EOC's policies indicating that Investigations should be prompt, as well as typically carried out within 60 working days.

216.    In addition to violating policies, the length of the Investigations, paired with the length of the Assessments, allowed for ample discussions among Reporting Parties and witnesses, as well as for gossip and speculation to spread at the SSW, which in turn contaminated and biased the Investigations. This gossip included disclosures to, and conversations with, Denby-Brinson, Dean of the SSW, Administrative Advisor to the Investigation, and subsequent member of the deciding Outcome Team.

217.    Also, EOC's Investigations of Wretman included a substantial number of University policy-based procedural violations, which when taken together, amounted to a clear and material lack of compliance to EOC's own policies and procedures.

218.    Specifically, EOC policies require Investigations that are thorough and impartial and are designed to provide a fair and reliable gathering of the facts. In actuality, EOC's investigations of Wretman were biased, incomplete, unreliable, and unfair.

Case 1:24-cv-00233-TDS-JLW   Document 1-3   Filed 03/15/24   Page 37 of 82

219.    EOC fully combined its Investigation of Wretman with an Investigation it was conducting of Macy, which both bear the same case number (#T0001472021), in ways that needlessly complicated, as well as biased, Wretman's specific Investigation and its findings.

220.    As an example, Enlow and James-Whidbee were lead Investigators on both Macy's and Wretman's Investigations. Also, Enlow and James-Whidbee conducted all Investigation interviews in such a way that they fully combined Wretman's matters with Macy's matters when asking questions of Reporting Parties and witnesses.

221.    EOC named Denby-Brinson as the Administrative Adviser for Wretman's Investigations even though he did not have and never had a formal position at the SSW. When Wretman queried Hall about why Denby-Brinson had been named to this position for his Investigations via an email in December 2021, he was informed that Hall had made this decision, and it would not be altered.

222.    Enlow and James-Whidbee did not assess for reliability among those involved in the Investigations. Interview statements from Reporting Parties and several witnesses included falsehoods, gross mischaracterizations, hearsay, and the repeating of unfounded gossip.

223.    Overall, numerous Reporting Parties and witnesses, including Godoy, Luo, Meehan, Klein, Van Deinse, Ward, and Chapman, reported mischaracterizations and/or falsehoods that influenced the Investigation Report and Findings, and yet were unchecked by UNC-CH. Also, Wretman was never presented with the testimony of these parties for him to respond with his perspective.

224.    For example, Godoy declared to Investigators that Rizo and Macy were constantly having her work with Wretman and that she could not ask Rizo or Macy for help. Contrary to these statements, Godoy in fact had only three Zoom meetings with Wretman over the entire 2020-2021

academic year all related to statistics, which was highly relevant to Wretman's expertise and role. In contrast, Godoy had regular, typically biweekly, meetings with Rizo.

225. For example, Klein's Interview included numerous unfounded statements that were both hearsay and highly derogatory of Wretman, including, as an example that she would be unsurprised to learn that Wretman had physically threatened someone. Klein also declared, solely based on gossip and hearsay that Wretman would frequently state to female SSW doctoral students that they should sleep with male faculty who had a lot of publications.

226. For example, Van Deinse grossly mischaracterized Wretman's expertise and qualifications to Investigators declaring that her master's students were fully capable of conducting the statistical analyzes that Wretman conducted.

227. For example, Ward inaccurately recounted a conversation to Investigators between Wretman and a UNC-CH faculty member on which Ward had eavesdropped years prior through an office wall, without ever indicating to the Investigators how she had come to overhear the discussion.

228. Contrary to EOC's own Investigation Guidance, which asks Investigation participants to not discuss the details of their accounts with other witnesses, witnesses shared considerable information with Investigators that they could have only learned through discussions with Reporting Parties and other witnesses.

229. For example, Klein repeated many statements in her Interview that were from Reporting Parties as if she had experienced and/or witnessed these events herself.

230. The sharing of allegations and perspectives among Reporting Parties and witnesses biased the Investigations, particularly because Enlow and James-Whidbee never queried Investigation participants about whether they were direct witnesses to events.

39

231.    Throughout all the Investigation interviews, Investigators regularly asked leading questions of Reporting Parties, Responding Parties, and witnesses, thus violating the fairness guidance of UNC-CH policy.

232.    Interviews with Reporting Parties and several of the witnesses were conducted before NOI's were issued at all. Also, about nine interviews with Reporting Parties and witnesses were conducted before EOC issued the final version of its NOI to Wretman. Without a NOI detailing what aspects of Wretman's alleged conduct or what aspects of University policies were being investigated, Enlow's and James-Whidbee's interview questions and methods were thus not grounded in evidence, facts, nor policy.

233.    Concerning Wretman's participation in the Investigations, the NOIs he received contained scant detail of the specific allegations he was facing, which in turn, diminished his ability to participate effectively and fully in his own Investigation interview and processes.

234.    During his Interview, Investigators never presented Wretman with or gave him an opportunity to respond to much of the key information that they collected and used later in their analysis and determinations of findings, including erroneous testimony from Reporting Parties and witnesses, which Enlow and James-Whidbee later included in their final Report.

235.    For the entirety of the investigation, Wretman was only allowed one Interview meeting and limited opportunities to submit his own evidence, especially as he was neither presented with all testimony nor inflammatory text that would later appear in his Investigation Report, which was reviewed by all UNC-CH decision makers.

236.    Witnesses who Wretman recommended to Investigators, and who could have provided relevant evidence and testimony, were never contacted for Interviews.

237. In contrast, Investigators spent considerable time speaking with Klein, Ward, and others who had no direct knowledge of the Reporting Parties allegations.

## ADMINISTRATIVE AND OUTCOME TEAM REVIEW: APRIL 2022

238. Per the PPDHRM Procedures Policy, upon completion of an Investigation, an initial version of an Investigation Reports is sent to the Administrative Adviser for review. Following such a review, an Outcome Team is then gathered to determine a course of actions based on the Findings as well as other relevant information.

239. The PPDHRM Procedures defines other relevant information and details their use in the following ways. "In determining the appropriate course of action, the investigator and the Outcome Team shall consider the following factors: (1) the nature and violence of the conduct at issue; (2) the effects of the conduct on the Reporting Party; (3) the effects or implications of the conduct on the work environment, the community, or the University; (4) whether the conduct involved an abuse of power or authority; (5) prior misconduct by the Responding Party, including the Responding Party's relevant prior discipline history, both at the University or elsewhere, including criminal convictions; (6) whether the Responding Party has accepted responsibility for the conduct; (7) maintenance of a safe and respectful environment conducive to learning and working; (8) protection of the University community; and (9) any other mitigating, aggravating, or compelling circumstances to reach a just and appropriate resolution in each case."

240. Sometime in April 2022, Enlow and James-Whidbee finalized their Investigation Report concerning Wretman and submitted it to Denby-Brinson for review.

241. What happened during the administrative review, including whether and how Denby-Brinson and/or others may have participated in the finalization of the Investigation Reports is unknown.

41

242.     Following the Administrative Review, per the PPDHRM Procedures, Hall would have solely directed the organization of an Outcome Team, as well as an Outcome Team meeting to discuss the Investigation Report, the Investigation Findings, and to determine a course of action following the Investigations of Wretman.

243.     By information and belief, the Outcome Team, who met sometime in late April 2022, included at least Denby-Brinson, Enlow, Hall, James-Whidbee, and Holmes. Also, an attorney from OUC was also a participant at the Outcome Team's meeting.

244.     Sometime in April 2022, Holmes became involved in Wretman's EOC matters as he is the Sheps Center Director, where Wretman's sole formal UNC-CH position rested. Accordingly, Holmes was also on the Outcome Team and attended the Outcome Team's meeting concerning Wretman.

245.     Notably, no one on the Outcome Team, including Holmes, had directly worked with Wretman over the course of his UNC-CH career.

246.     Moreover, his direct Supervisor, Zimmerman, who was the person who knew Wretman as an employee the best of anyone at the University, was not included in the Outcome Team's discussions and decision-making.

## INVESTIGATION FINDINGS AND REPORTS: MAY 2022

247.     On or about May 6, 2022, Wretman received via email notification from Hall that EOC had determined there was insufficient evidence to conclude that he had violated the University's policies concerning Harassment and Bullying.

248.     That same communication from Hall also declared that there was a preponderance of evidence indicating that he had violated the University's policy against Retaliation per Meehan's allegations and Report.

42

249. The PPDHRM Procedures declare that a preponderance of the evidence means that it is more likely than not that the conduct occurred.

250. Although the Bullying and Discrimination allegations against Wretman were not found, the EOC reports about these allegations contained highly prejudicial conclusions and statements, such as declarations that Wretman was highly inappropriate, that were not based in fact, evidence, or policy, but nonetheless were read by all decision makers who were presented with Enlow's and James-Whidbee's Reports.

251. In making these prejudicial conclusions in their Reports, Enlow and James-Whidbee relied on the statements of Reporting Parties, as well as witnesses who had contact and conversations with Reporting Parties.

252. Relatedly, Enlow and James-Whidbee treated the Reporting Parties and witnesses who had contact with the Reporting Parties as especially credible, while also discounting the credibility of every witness who had made positive statement about Wretman.

253. Enlow's and James-Whidbee's Investigation Reports also included a substantial number of University policy-based violations, which when taken together, amount to a clear and material lack of compliance to EOC's own policies and procedures.

254. In violation of the PPDHRM Procedures policy, evidence from the Investigation interview transcripts shows that Enlow and James-Whidbee did not summarize all the information gathered nor did they synthesize the areas of agreement and disagreement among key facts.

255. In violation of the PPDHRM procedures policy, which requires a fair and reliable gathering of facts, the reports state that Wretman did not provide any evidence that Reporting Parties were acting frivolously or in bad faith, when in fact, Enlow and James-Whidbee never queried Wretman about these topics nor offered Wretman an opportunity to provide such evidence.

43

256. Concerning the finding of Retaliation, in violation of the PPDHRM procedures policy, Enlow and James-Whidbee discounted or ignored facts and evidence that contradicted the finding that Wretman violated this policy, which overall, resulted in a flawed determination against him.

257. Generally, and per UNC-CH's own policy, a finding of Retaliation requires three elements. Such a finding requires, first, knowledge or perception of protected activity, such as an employee expressing concern about discrimination to a supervisor; second, an adversity for the person expressing that concern; and third, a connection between the knowledge of protected activity and the adversity, such that the person enacting the adversity against the person reporting a concern did so because the person was engaged in protected activity. Enlow's and James-Whidbee's reporting and analysis of the so-called facts of Meehan's matters meets none of these three elements.

258. Concerning knowledge of protected activity, Wretman had no specific knowledge or perception that Meehan had spoken with Luo in the week or so before Luo met with Macy in early June 2021 to report her allegations, let alone the nature of that conversation. Moreover, Enlow and James-Whidbee collected no evidence regarding whether Wretman had specific knowledge or perception that Meehan was part of a conversation that led to Luo reporting her allegations to Macy. Nor did Enlow and James-Whidbee establish that mere awareness of a party having potentially talked to others constitutes a perception of protected activity specifically.

259. Concerning an experience of adversity, per UNC-CH's own EVERFI Preventing Harassment and Discrimination Training, an adverse action is a deed that has a major impact on a person's employment and/or educational benefits, conditions, and opportunities. Although in her contemporaneous response to Wretman, Meehan expressed being slightly confused and saddened

by Wretman's email, she also stated that her door was open if Wretman became interested in resolving the conflict. Likewise, Meehan made no indication in her Investigation interview that she experienced any impact on her employment at PCANC or even in any future educational or employment opportunity that she might pursue. Further, contemporaneous with EOC's Assessments and Investigations, Meehan and Wretman worked constructively and positively, along with others, to ultimately publish a peer-review paper on which Meehan is the lead author.

260.    Enlow and James-Whidbee completely neglected to address the third element of a Retaliation determination in their Report and analysis, which is whether there was a connection between knowledge of protected activity and the action that led to an adversity.

261.    Enlow and James-Whidbee also ignored Wretman's Interview statement, in which he explained that at the time he sent the email to Meehan he felt that his professional world was collapsing around him, that he was trying to protect himself, and that it was never his intention to retaliate against Meehan.

262.    Rather than collecting evidence and conducting a robust analysis based on factual evidence, Enlow and James-Whidbee relied on a highly speculative story about Wretman's email that emerged across Investigation interviews among Reporting parties and the witnesses who had been in communication with one another during the lengthy Assessments and Investigations.

263.    In essence, the speculation across Reporting Parties' and witness statements conjectured that when Luo complained to Macy, she told Macy that she and Meehan had spoken recently, that Meehan validated Luo's allegations, and that Meehan was willing to serve as an EOC witness for Godoy and/or Luo. This speculative story went onto posit that Macy then told Wretman about Luo's allegations as well as Meehan's involvement. In fact, Macy did not share any specific information with Wretman about Luo's concerns, including any mention of Meehan.

264. Nonetheless, Enlow's and James-Whidbee's erroneous analysis and determination relied on such speculations, with no evidence, that Wretman knew that Meehan was involved in Luo's allegations made to Macy and that Wretman was somehow thus motivated to send an email to Meehan, all based on a conjectural conversation between Macy and Wretman that never actually happened.

265. In addition to not meeting these three required elements of a Retaliation determination and solely relying on the speculative statements, the EOC Investigation Report contains absolutely zero analysis regarding whether EOC had any jurisdiction over Meehan in early June 2021, a date by which she had graduated from the SSW and, thus, had no formal relationship with UNC-CH.

266. Per the PPDHRM, as part of an Investigation, EOC must have jurisdiction over any Reports or Misconduct as well as Reporting Party. Specifically, according to the PPDHRM, EOC can consider Reports in their jurisdiction as along as "the conduct occurred in the context of an employment or education program or activity of the University, had continuing adverse effects on campus, or had continuing adverse effects in an off-campus employment or education program or activity of the University."

267. Given that at the time of his email, Meehan was no longer part of the UNC-CH community and given that none of Wretman's and Meehan's interactions were part of a UNC-CH program or activity, EOC's entire line of inquiry into Meehan's allegations was not explicated or justified.

268. Although the PPDHRM Procedures require Investigators to include recommendations for disciplinary action and other corrective measures, if appropriate, Enlow's and James-Whidbee's Reports make no such recommendations.

269.     Also in violation of the PPDHRM Procedures, Enlow's and James-Whidbee's Reports make no mention of the nine sets of factors that they and the Outcome Team are required to consider when recommending a course of action based on the Investigation Findings.

270.     In Wretman's EOC matters there were several mitigating factors that Enlow and James-Whidbee should have noted in their report. Examples of these factors include:

- Wretman has no prior disciplinary history at UNC-CH in any capacity, either as a student or as an employee.
- EOC violated the PPDHRM by not informing Wretman of their conceptualization of Retaliation when they had the opportunity in communications and meetings with him.
- Had Wretman been apprised by EOC of their conceptualizations and/or had received other information or supports that were due to him per the PPDHRM policy, he may never have sent the email that he did.
- Wretman never had a formal relationship with Meehan during her matriculation at UNC, either as an Instructor or as a Supervisor.
- Despite the email, Wretman in fact did communicate and work with Meehan throughout 2021 and into 2022 by conducting statistical analyses and writing for a scientific paper on which Meehan is the first author.

271.     Harmfully, despite Enlow's and James-Whidbee's clear and material lack of compliance to EOC's own policies and procedures, they published their Investigation Reports to decision-makers, including Hall, Holmes, Denby-Brinson, and others.

272.     Moreover, Enlow and James-Whidbee never offered Wretman an opportunity to respond to the multiple errors of fact and highly prejudicial statements, which to-date Wretman never had an opportunity to address or refute.

## WRETMAN'S OUTCOME PROCESS: MAY 2022

273.     Shortly after receiving the notification of the Findings from Hall, Wretman was contacted that same day via email by Holmes indicating that he was initiating a process to discharge Wretman from his employment at UNC-CH for cause based on the EOC Investigation Report and the finding that Wretman violated the UNC-CH Retaliation policy.

47

274. Wretman's outcome resolution process, which Holmes led, included a substantial number of University policy-based procedural violations, which when taken together, amount to a clear and material lack of compliance to UNC-CH's policies and procedures.

275. The first step in this process was policy-based Pre-Discharge Conference between Holmes and Wretman, which was held via two Zoom meetings on or about May 9, 2022 and May 12, 2022, and also attended by Ms. Angenette McAdoo, Senior Director in Employee Management Relations at UNC-CH.

276. This first meeting was prematurely concluded after it became clear, to the surprise and ignorance of Holmes and McAdoo, that Wretman had never been provided with EOC's Investigation Report.

277. Wretman was later provided with a heavily redacted and limited version of this Report, but not the full Investigation record, on or about May 10, 2022.

278. Each meeting was about 45 minutes long and consisted of Holmes and McAdoo asking Wretman questions about his email to Meehan, Meehan herself, and Wretman's relationship with Meehan.

279. The conversation at both meetings was investigatory in nature and essentially duplicated the discussions Wretman had with Enlow and James-Whidbee.

280. Nothing in either conversation indicated clearly how and why Holmes, as well as the Outcome Team, arrived at their ultimate decision of Discharge for Cause, or whether the nine sets of mitigating factors that should have been considered per the PPDHRM Procedures were fully considered if at all.

281.    In addition to the Pre-Discharge Conference meetings, Holmes indicated via email to Wretman that he sought UNC-CH Provost J. Christopher Clemens review and approval of his final decision concerning Wretman's employment before communicating that decision to Wretman.

282.    On May 23, 2022, Holmes and Wretman met again via Zoom. Holmes told Wretman verbally that he had made the decision to Discharge Wretman solely based on the determination that Wretman had violated UNC-CH's Retaliation policy.

283.    Holmes also delivered his Discharge for Cause decision to Wretman in a letter delivered both via email and an overnight delivery to Wretman's personal email address and home address.

284.    During the Pre-Discharge Conference meetings, Holmes related that he had reviewed all of Wretman's Investigation Report. Consequently, Holmes biased his decision-making by reading false and unfounded allegations, as well as highly erroneous and prejudicial statements against Wretman.

285.    None of the testimony of Godoy, Luo, or most all the witnesses was at all relevant to Wretman's email to Meehan and the determination of Retaliation.

286.    Thus, per the PPDHRM procedures policy, Investigation report text concerning any other aspects of the Investigation, including the Bullying and Harassment allegations, should not have been read by Holmes nor any decision-makers, including Clemens and Denby-Brinson.

287.    Further, Holmes stated in his Discharge letter that his decision was based on the evidence presented in the EOC investigation, which is expressly not how the decision is supposed to be made per UNC-CH policy.

288. Contrary to the PPDHRM policy, Holmes missed the importance of considering mitigating factors in making his decision.

289. Wretman was also not given an opportunity to respond and offer any explanation, verbally and/or in writing as to why he believed that he should not be discharged per the UNC-CH Employment Policies for EHRA Non-Faculty Instructional, Research and Public Service Staff, and Tier II Senior Academic and Administrative Officers policy.

290. Holmes's letter also included factual errors about the EOC Investigations, which indicated that he did not have a full and accurate understanding of the facts in the case.

291. Relatedly, Holmes's letter restated the speculation that Wretman sent the email to Meehan because Wretman knew Meehan had talked to Luo, which was not in any way supported by facts or evidence.

292. Like the two Pre-Discharge Conference meetings, nothing in Holmes's final written Notice of Intent to Discharge supported how and why Holmes arrived at his rationale for Discharge.

293. In violation of the PPDHRM Procedures policy, Holmes's written Notice also did not discuss whether and how he considered any mitigating factors in making his decision to Discharge Wretman.

294. Relatedly, the PPDHRM Procedures are clear in stating that Discharge is only appropriate when behavior is so harmful to the educational process and the work environment that it requires severe action such as Discharge. Nonetheless, Holmes did not provide justification that Wretman's email, even if adjudicated to be Retaliation, required such severity.

50

## WRETMAN'S APPEAL PROCESS: JUNE 2022 TO MAY 2023

295.    Following Holmes's erroneous and undocumented Discharge for Cause decision, Wretman began the Appeal process that was afforded to him as an EHRA non-faculty member, which entailed four phases and lasted nearly a full calendar year.

296.    Like all the stages of this process that had come before, Wretman's appeal process included several University policy-based procedural violations, which when taken together, amount to a clear and material lack of compliance to UNC-CH's own policies and procedures.

### WRITTEN GRIEVANCE

297.    The first step in Wretman's appeal process entailed completing a formal Grievance form. Wretman did so by filing a two-components Grievance.

298.    As directed by UNC-CH Human Resources, he filed both with Ms. T. Adele Mayfield, Senior Consultant in UNC-CH's Employee and Management Relations, on or about June 6, 2022.

299.    The first component of Wretman's Grievance was against EOC's determination, delivered by Hall, that there was a preponderance of evidence that Wretman violated the University's Retaliation policy per PPDHRM.

300.    As part of the first component of his Grievance, Wretman raised the issue of EOC's jurisdiction over Meehan and her allegations as the issue of jurisdiction had not been addressed in the Investigation Report.

301.    The second component of the Grievance concerned the decision, made and delivered by Holmes, that such Retaliation constituted misconduct, which necessitated Wretman's Discharge for Cause from UNC-CH.

302.    Per the University's policy, Hall was required to provide a Reply to Wretman's

Grievance.

303.    After requesting an extension, which delayed the timeliness of Wretman's appeal process, Hall responded on or about July 18, 2022.

304.    In her response overall, Hall denied Wretman's grievance and essentially reiterated the erroneous analysis presented by Enlow and James-Whidbee in their Investigation Report. Thus, Hall implicitly indicated her support for and agreement with both the Retaliation determination and the Discharge for Cause decision.

305.    In her response to the issue of jurisdiction, Hall presented new argument, which had not been part of any aspect of the Investigation or Outcome Process, that because the Wretman-Meehan relationship "arose out of" time at UNC-CH, EOC thus had jurisdiction over Wretman's email, which is contrary to PPDHRM and related policies that contains zero language regarding jurisdiction over such external relationships. Also, Hall attempted to argue that because Wretman used his UNC-CH email address to email Meehan, his action was part of his employment activity despite the PPDHRM having no such language regarding email usage and UNC-CH seemingly have no related email policy for employees.

## HEARING

306.    The second step in the appeal entailed a Hearing.

307.    In advance of the Hearing, Wretman requested, via an email to Mayfield, that he be given access to the full Investigation record, including EOC's Investigation Report, the Reports' appendices, and the Interview transcripts. Mayfield never replied to Wretman's request and effectively ignored Wretman.

308.    Thus, prior to his hearing, Wretman was never provided with the full Investigation record including the full Report.

309. With no response from Mayfield and very limited access to any of the Investigation record, Wretman was clearly disadvantaged in his preparations for and participation in the Hearing.

310. Also, Wretman provided clear photographic proof of a positive COVID-19 test in advance of the Hearing and requested a reasonable extension to give him additional time to recover and be able to consult with his attorney in person. This request was denied without explanation thus disadvantaging Wretman further.

311. The Hearing was held on or about August 30, 2022, via Zoom, and was comprised of a three-person panel of UNC-CH employees who were also EHRA non-faculty employees.

312. These individuals were Mr. Jeffrey Campbell, who is Head of Infrastructure Management Services for the University Libraries, Ms. Margaret Barrett, who is the Associate Director for the Carolina Center for Public Service, and Ms. Lora Wical, who is Deputy Director and Senior Assistant Dean for UNC-CH Advising.

313. Per UNC-CH policy, Campbell, Barrett, and Wical had authority and responsibility to direct Wretman's Hearing including making specific and impactful decisions about its nature.

314. Despite all being EHRA non-faculty employees at UNC-CH, none of the three had a position remotely like Wretman's position as a Research Professional, which meant that Wretman's Grievance and Appeal were not adjudicated by his professional peers.

315. The Hearing itself last about four hours in total, but with only 90 minutes for Wretman to present his case. Per agreement from all, Wretman was grieving two matters, the Retaliation determination, and the Discharge for Cause decision, but was not provided additional time between the supposedly typical 90 minutes allotted for such matters. Of note, UNC-CH policy in no way stipulates "90 minutes" to be the length of such a Hearing.

316. Campbell, as the Panel Chair, thus made an individual disadvantaging decision to limit the length of the Hearing which prevented Wretman from having a full opportunity to state his case.

317. Relatedly, Campbell also made an individual decision to deny Wretman's desired inclusion of 12 letters of support from colleagues that attested to Wretman vis-à-vis policy-based mitigating factors.

318. Given the content of these letters, which was highly laudatory of Wretman, Campbell's decision, in violation of UNC-CH policy, clearly and materially disadvantaged Wretman in his Hearing and Appeal processes.

319. Wretman and his attorney presented his Grievance and Appeal which elaborated on his step #1 written grievance. Briefly, their presentation including an opening statement, interviews with Enlow, Hall, and Holmes as witnesses, Wretman being briefly questioned by an OUC attorney, Ms. Marla Bowman, and a closing statement.

320. After Wretman's presentation, the Hearing panel met to decide whether Wretman had made an initial case for his Appeal. Ultimately, the Panel decided he had not.

321. Conspicuously, the Panel met for a lengthy period before reaching this decision. The Panel repeatedly requested time extensions to continue their deliberations, and repeatedly referred to needing to seek the guidance of their UNC-CH attorney from OUC. UNC-CH policy in no way states that the Panel's decision should be guided by UNC-CH OUC, making this guidance seeking a policy violation, a clear and material error, and likely biasing.

322. While the nature of the panel's discussion and their decision-making is unknown, such indicators signal that the panel's decision-making and determinations were not straightforward.

323. As a final step in the Hearing, Wretman received a written report from the Panel on or about September 27, 2022.

324. The Panel's written response gave no justification for their decision nor offered any explanation for how they arrived at their decision.

325. The Panel's response also erroneously indicated that Wretman provided no evidence when Wretman had previously supplied an extensive written rebuttal, which Campbell allowed into evidence.

326. The Panel's response also did not address witness testimony indicating UNC-CH policies may not have been followed and/or how UNC-CH processes may have been biased.

327. For example, in response to questions from Wretman's attorney about PPDHRM Procedures being followed, including whether and how mitigating factors were discussed by the Outcome Team, both Enlow and Hall replied that they could not recall discussions and decisions that had been made only a few months before.

328. For example, in his Hearing testimony, Holmes indicated that he made his decision to Discharge Wretman based on sex-based stereotypes. Specifically, Holmes stated that, when considering how to discipline Wretman, Holmes considered that based on Wretman's adjudicated conduct, he believed that Wretman would need to be monitored around colleagues and students, most of whom were female. The idea that males are dangerous and must be monitored around females is replete with sex-based stereotypes, thus making Wretman's Discharge decision highly subjective. Holmes went on to state that because ensuring that Wretman would be monitored would be logistically difficult. Thus, Holmes continued that he felt that he had no choice but to choose Discharge over a lesser punishment. In sum, Holmes perceptions of Wretman vis-à-vis the need for monitoring around colleagues and students, who were mostly female, was the deciding factor

55

for his selection of Discharge.

**CHANCELLOR REVIEW**

329.    As the next step in his appeal process, Wretman submitted an Appeal to then Chancellor Kevin Guskiewicz on or about October 7, 2022. While Guskiewicz ultimately denied Wretman's appeal, Guskiewicz's process entailed two aspects, both of which were violations of UNC-CH policy and detrimental to Wretman.

330.    First, upon information and belief, Godoy was a student in a course comprised of about 25 students that Guskiewicz taught in Fall 2022 while Wretman's Appeal was moving forward to Guskiewicz.

331.    As Godoy was the primary Reporting Party in Wretman's EOC matters, this set of circumstances presented a critical complication for Guskiewicz's review of Wretman's Appeal given that the relationship between instructor and student can be a close one, particularly when the class size is small.

332.    Also, by information and belief, as part of one of her assignments, Godoy gave an autobiographical presentation about her journey as an academic that included discussions of Wretman's EOC matters.

333.    Godoy's presentation of her EOC experiences likely biased Guskiewicz impressions of Wretman's matters. Thus, in turn, created a conflict of interest for Guskiewicz in rendering a decision about Wretman's appeal. Both are violations of UNC-CH policy regarding such appeals.

334.    Second, Guskiewicz repeatedly missed policy-based deadlines to deliver his response.

335.    On or about November 7, 2022, in a communication relayed by Ms. Christi Hurt,

56

Guskiewicz noted a policy-based 15 calendar day deadline and notified Wretman of the need for extra time until on or about November 18, 2022.

336.    Then and not until an email relayed by Mayfield on or about December 12, 2022, was Guskiewicz's decision, made on or about December 9, 2022, delivered.

337.    Thus, Guskiewicz missed his initial deadline to note the need for an extension by 3 days, and his own stated second deadline to deliver his response to Wretman by 25 days.

338.    Altogether, Guskiewicz's process violated University policy by lasting 67 days in total, which delayed the timeliness of Wretman's appeal process further, and stands in stark contrast to the policy's stated 15 calendar days.

339.    Like all previous steps in Wretman's process, Guskiewicz's December 2022 written response to Wretman's appeal gave no justification for his decision nor offered any explanation for how he arrived at his decision.

## BOARD OF TRUSTEES REVIEW

340.    Following the denial of Wretman's appeal by Guskiewicz, Wretman advance his appeal to step #4 involving a review by the UNC-CH Board of Trustees (BOT) on or about December 23, 2022.

341.    Wretman was first notified that his appeal had been received and was being reviewed by the BOT via an email from Ms. Carolyn Pratt, UNC-CH Director of University Governance and Associate University Counsel, on or about January 30, 2023.

342.    Pratt's email noted that Wretman's appeal was accepted and was to be reviewed by a three-member panel of the BOT. This panel comprised Mr. William Marshall Kotis, Mr. Ralph Meekins, and Ms. Teresa Artis Neal, with Kotis acting as Chair.

343.    Upon information and belief, the panel was individually chosen by BOT Chair Mr.

David Boliek.

344. Pratt's email also included the relevant BOT policy related to Wretman's appeal at this fourth step, a policy which Wretman had previously never been provided or to which he had been instructed to tailor his grievance.

345. Of importance, the BOT policy language framed appeals in terms of a "clear and material" errors, a phrase which had not previously appeared in UNC-CH policies.

346. Thus, Wretman's grievance was highly disadvantaged by not having key information regarding this language from the start of his appeal process.

347. As part of Wretman's appeal, Hall was invited by the BOT to provide a written response, in which she presented new information, analysis, and documents, and with which Wretman had never been presented before.

348. Unfairly, Wretman was not given an opportunity by the BOT to respond to Hall's new materials, despite making a request on or about April 10, 2023 to be able to do so. This decision was delivered by Pratt on April 25, 2023.

349. On March 29, 2023, the panel via Pratt informed Wretman that they were taking an extension to make their decision, which delayed the timeliness of Wretman's appeal process further.

350. Ultimately, the BOT panel, in a 2 to 1 vote upheld the University's decision to Discharge Wretman on or about May 13, 2023, which was 142 days after Wretman appealed to the BOT and well over 300 days since Wretman began his appeal process in early June 2022.

351. Also, like all previous steps in Wretman's process, the BOT's panel's written response to Wretman's appeal gave no justification for their decision nor offered any explanation for how they arrived at their decision.

352. Interestingly, the BOT's final decision included the following note regarding the dissenting vote: "One member of the Panel voted against upholding the Chancellor's decision on the grounds that he did not believe the record evidence showed that in reaching the decision to discharge Dr. Wretman, the University adequately considered the effectiveness of other potential disciplinary options available under University policy."

## WRETMAN REPEATEDLY REPORTED CONCERNS

353. Overall, Wretman's EOC and Appeal processes, which began for him in May 2021 with an emailed meeting invitation from Chapman and ended for him in May 2023 via an email with the BOT's panel's decision, lasted over two years.

354. During this time, in addition to participating actively and honestly in EOC Investigations and Outcome Processes, as well as Appeal Processes, Wretman made numerous good faith statements of concern, as well as formal written complaints about how UNC-CH processes were being mishandled and mismanaged, in violation of University policies.

355. On multiple occasions, Wretman communicated with administrators in EOC, OHR, OUC, the SSW as well as Institutional Integrity and Risk Management during EOC Assessments and Investigations with concerns that the processes were not being conducted according to policy.

356. When those efforts resulted in no action, Wretman filed two detailed Whistleblower reports via UNC-CH's official Carolina Ethics Line (CEL) process, one in January 2022 and a follow-up one in January 2023.

357. Wretman effectively received no response to either CEL Whistleblower report.

358. Wretman also raised serious concerns about his processes during the steps of his appeal, including in step #2, step #3, and step #4.

359. UNC-CH staff and administrators, including the BOT, effectively completely ignored all Wretman's stated concerns.

360. In brief, none of these efforts resulted in any sort of remedy or review of how Wretman had been treated or how his matters had been managed.

## WRETMAN EXHAUSTED ADMINISTRATIVE AVENUES

361. In addition to exhausting all his administrative remedies within UNC-CH, Wretman has also sought administrative remedies external to UNC-CH. This included the U.S. Equal Employment Opportunity Commission (EEOC; Charge #433-2024-00384) and Office of Civil Rights (OCR; Case # 11-24-2079) at the United States Department of Education

362. EEOC ruled on or about November 17, 2023 that they would not pursue any investigation against UNC-CH based on Wretman's allegations, thus providing him the right to pursue individual legal action against UNC-CH within 90-day timeline.

363. The OCR ruled on or about December 15, 2023 that they would not be pursuing any investigation against UNC-CH based on Wretman's allegations, and also defaulted further action to EEOC.

## DAMAGES TO WRETMAN

364. Wretman has experienced considerable harms from these UNC-CH matters and processes.

365. Professionally, Wretman has had his reputation at the SSW, the Sheps Center, UNC-CH, and at places beyond irrevocably tarnished.

366. Because of a woeful lack of confidentiality in all facets of UNC-CH EOC's matters, social work colleagues, both at UNC-CH and at other universities, now know that Wretman has been involved in a UNC-CH EOC Investigation that resulted in a determination.

367.     Although few colleagues may know the details, these matters have a strong potential to cloud future working relationships and professional opportunities for the entirety of Wretman's career.

368.     Financially, Wretman has suffered lost salary and benefits while waiting on UNC-CH's protracted appeals process that was repeatedly delayed, which is tremendously damaging to his present and future financial health.

369.     In addition, Holmes's Discharge decision was delivered to Wretman about six weeks before Wretman's five years of service to the University and thus just before Wretman was to be vested in the UNC-CH' retirement program, also resulting in a considerable financial loss.

370.     Wretman has also experience extreme stress, anxiety, sleeplessness, and damage to his overall well-being. Wretman will never be the same following from this deeply unfair and prolonged case.

## FIRST CLAIM FOR RELIEF – VIOLATION OF TITLE IX 20 USC § 1681
## (Against – University of North Carolina at Chapel Hill)

371.     Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

372.     Title IX provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

373.     Title IX applies to all public and private educational institutions that receive federal funding, which includes Defendant University of North Carolina at Chapel Hill,

374.     Title IX prohibits any covered entity from discriminating "in employment, or recruitment, consideration, or selection therefor, whether full-time or part-time" "on the basis of sex." 34 C.F.R. § 106.51(a)(1).

61

375. Title IX requires a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b).

376. Defendant University of North Carolina at Chapel Hill discriminated against Plaintiff Dr. Wretman because of his sex by applying an unfair, unreliable, and partial process against him in resolving the complaints against him.

377. The outcome in this case was erroneous, because Plaintiff Dr. Wretman was innocent and did not violate Defendant University of North Carolina at Chapel Hill's policies.

378. Gender bias was a motivating factor in Defendant University of North Carolina at Chapel Hill's findings against Plaintiff Dr. Wretman.

379. Defendant University of North Carolina at Chapel Hill failed to conduct an adequate, reliable, and impartial investigation.

380. Defendant University of North Carolina at Chapel Hill's discriminatory process deprived Plaintiff Dr. Wretman, a male, of employment opportunities and imposed discipline on him on the basis of his sex.

381. Defendant University of North Carolina at Chapel Hill applied its policies and procedures in a gender-biased manner and discriminated against Plaintiff Dr. Wretman on the basis of his sex, which led to an erroneous and adverse employment outcome.

382. Particular circumstances suggest that the outcome was erroneous, and include, without limitation:

a. Defendant University of North Carolina at Chapel Hill's PPDHRM policy is an unreliable method of determining fault because:

i.   Empowers the same investigators with the power to find facts as well as to prosecute the case;

ii.   Does not require a preliminary determination that a complaint is well-founded before allowing an investigation;

iii.   Does not require investigators to inform the target of the investigation about the nature of the charges or his right to an advisor before commencing an interview;

iv.   Allows investigators to draw an adverse inference from a target's silence, lack of cooperation, or use of an advisor in the investigation;

v.   Does not require investigators to tell the target the nature of the evidence against him;

vi.   Does not guarantee that a target will be provided an advisor;

vii.   Does not allow active participation by the target's advisor in the investigation;

viii.   Does not allow a participant to directly question any witness;

ix.   Does not provide the target with the right to confront his accuser;

x.   Does not provide a live hearing to resolve factual disputes;

xi.   Does not require that any witness interview be recorded;

xii.   Does not require that any witness provide sworn testimony;

xiii.   Does not require investigators to disclose exculpatory or other favorable evidence to the target of the investigation;

xiv.   Does not place a burden of proof on the accuser; and

xv.   Premises a finding of responsibility on a mere preponderance of the evidence.

b.    The investigation against Plaintiff Dr. Wretman was unreliable because it disregarded many of the few procedural protections PPDHRM provided as referenced throughout the Complaint.

c.    The Investigators' Determinations Were Biased and Unreliable because the investigators for all the reasons referenced throughout the Complaint including but not limited to conducting joint investigations with Dr. Macy's investigation, conducting both investigations under the same case number, and failing to interview witnesses provided by Dr. Wretman.

383.    Particular circumstances suggest that gender bias was a motivating factor in the erroneous outcome, and include, without limitation:

a.    Circumstances suggest that Defendant UNC-CH adopted PPDHRM in an effort to lower the protections for males accused of sexual misconduct, and include, without limitation:

i.    PPDHRM was adopted to avoid enforcement by Office of Civil Rights;

ii.    PPDHRM was adopted to avoid rescission of federal funds by Education Department;

iii.    Even after the adoption of PPDHRM, the Campus Code of Conduct was used for other investigations not related to sexual misconduct;

iv.    Upon information and belief, statistically the overwhelming majority of investigations that have ever been conducted by Defendant University of North Carolina- Chapel Hill into an alleged violation of PPDHRM have involved male respondents.

b.    The investigators disregarded certain provisions of PPDHRM as set forth above because of anti-male bias against Plaintiff Dr. Wretman.

384. Based on the foregoing, Plaintiff Dr. Wretman was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

385. As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, loss of career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

386. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## SECOND CLAIM FOR RELIEF – VIOLATION OF 42 U.S.C. § 1983 – DENIAL OF DUE PROCESS AND CONSPIRACY
### (Against All Defendant)

387. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

388. The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

389. Defendant UNC is a public entity that receives large amounts of state and federal funding and is therefore subject to the Fourteenth Amendment. UNC, the UNC System, the Board of Trustees, the Board of Governors, and the Individual Defendants, as state actors, are therefore bound by the requirements of the United States Constitution.

390. UNC, the UNC System, the Board of Trustees, and the Board of Governors as public institutions established by the State of North Carolina as well as the Individual Defendants, as agents of the University and individually, have a duty to provide employees and students equal protection and due process of law by and through any and all policies and procedures set forth by the University and the Constitution of the State of North Carolina.

391. Fourteenth Amendment due process protections are required in higher educational disciplinary proceedings. At a minimum, the Supreme Court has made clear that there are two basic due process requirements: (1) notice; and (2) an opportunity to be heard.

392. Where an employee at a public university faces discharge through a disciplinary proceeding, a serious property interest is at stake; a discharge will have a lasting negative impact on the individual's life, so heightened due process protections including a hearing, with the right to present evidence, cross-examine adversarial witnesses, and to call witnesses are required.

393. Plaintiff, an employee at UNC, faced disciplinary action that included the possibility of discharge. Accordingly, the Due Process provisions of the Fourteenth Amendment applied to the disciplinary processes utilized in Plaintiff's case, and Plaintiff was entitled to a process commensurate with the seriousness of the allegations and potential discipline, sanctions, and repercussions he was facing.

394. It is well established that a person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

395. It is also well established that a person has a protected property interest in pursuing and continuing his employment, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

396. As the Supreme Court has eluded the ultimate question of whether there is a protected interest in continued employment at the public university level, the critical inquiry undertaken by the Fourth Circuit in such cases focuses on whether the procedural processes adopted by the university conformed to due process standards.

397. There is no question that the University failed to afford Plaintiff the minimum procedural safeguards required by due process, before discharge.

398.     There also is no question that Plaintiff possessed both a constitutionally protected property and liberty interest.

399.     Plaintiff's constitutionally protected property interest in his continued employment at UNC, and his right to be free from an arbitrary discharge, derives from the policies, courses of conduct, practices and understandings established by UNC, as well as the express and implied contractual relationship between UNC and Plaintiff.

400.     By their very nature, the applicable University conduct policies and procedures create an employee right to continued employment and the right to be free from arbitrary and capricious decision making and sanctions, as the University does not unlawfully discriminate in offering equal access and that the University recognizes the rights of all members of the University community to learn and work in an environment that is free from Discrimination and Harassment.

401.     Furthermore, the UNC System has delegated the authority to its individual campuses to determine the policies with which it will ensure Due Process is complied with which resulted in the creation of the PPDHRM and related policies.

402.     Furthermore, the PPDHRM and related policies ensure that the Chancellor and Provost ensure every employee's right to due process.

403.     In consideration of the foregoing assurances, UNC's policies created a property right in Plaintiff's continued employment with the University, and a contractual right to protection against an arbitrary discharge.

404.     Plaintiff further has a constitutionally protected liberty interest because the allegations brought against Plaintiff ultimately resulted in a discharge from University of North Carolina at Chapel Hill, a sanction that will have significant and lifelong ramifications with respect to his education, employment, and reputation.

67

405.     Plaintiff was wrongfully discharged for an email to a non-member of the University Community.

406.     Thus, unless overturned, Plaintiff's discharge will remain a part of Plaintiff's permanent record and the stigmatizing label associated with the finding will impair his ability to seek further employment and related employment opportunities. Absent the relief sought through this matter, other individuals will inevitably come to learn of Plaintiff's wrongful discharge.

407.     Throughout the investigation and adjudication of the charges against Plaintiff, Defendants, individually and in concert, conspired to violate Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment when they deprived him of the minimal requirements of procedural fairness, proper notice, and a meaningful opportunity to be heard.

408.     Plaintiff's Due Process rights were violated in several ways, including but not limited to

a.     Insufficient notice of the allegations against him;

b.     Plaintiff was never able to cross-examine any of his accusers; and

c.     The Investigators, who are supposed to be neutral fact finders, refused to interview witnesses provided to them by Plaintiff.

409.     Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

410.    The Individual Defendants, as well as other agents, representatives, and employees of UNC acted under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

411.    Plaintiff seeks to hold the Individual Defendants liable in their individual capacities because they knowingly violated Plaintiff's clearly established constitutional rights, as well as UNC policies, when they took actions that led to his expulsion from the University, without affording Plaintiff proper notice and an opportunity to be heard.

412.    Defendant Hall knowingly violated Plaintiff's clearly established rights to notice, a meaningful opportunity to be heard, and the right to cross-examine witnesses.

413.    As Title IX Coordinator for the University, Defendant Hall engaged in further violations of Plaintiff's clearly established rights, through her ratification and/or approval of the actions committed by those under her supervision, including the Investigators.

414.    Without regard for Plaintiff's due process rights, the Defendants individually and collectively engaged in investigatory and adjudicatory processes that resulted in the improper discharge of the Plaintiff from the University and the UNC System.

415.    As fully detailed above, the unlawful actions taken by the Individual Defendants, acting in their individual capacities, were motivated by a malicious motive or intent or, at the very least, reckless, or callous indifference to Plaintiff's right to due process, warranting an award of punitive damages to Plaintiff.

416.    As a result of these due process violations, Plaintiff continues to suffer substantial injury, damage, and loss, including, but not limited to, loss of future career opportunities, reputational damage, economic injuries, and other direct and consequential damages.

417.     As a result of the foregoing, Plaintiff is entitled to prospective relief against

418.     Defendants, and compensatory and punitive damages against the Individual Defendants acting in their individual capacities in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

### THIRD CLAIM FOR RELIEF - BREACH OF CONTRACT
### (Against University of North Carolina at Chapel Hill)

419.     Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

420.     At all times relevant hereto, a contractual relationship existed between UNC and Plaintiff by virtue of Plaintiff's employment at UNC and as defined by and through UNC's policies and procedures governing employees, including but not limited to the PPDHRM.

421.     Through these policies, UNC provided specific, enforceable provisions outlining certain procedures that were to be followed by the institution before Plaintiff could be disciplined or discharged for violation of a university policy.

422.     Any failure to follow promised procedures in the disciplinary process would therefore constitute a violation of the University's contract with its employees.

423.     Accordingly, through the documents it publishes and provides to employees, UNC makes express and implied contractual commitments to employees involved in the disciplinary process and/or the investigation of potential violations of the policies.

424.     Under North Carolina law, the elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract.

425.     Based on the aforementioned facts and circumstances, UNC created express and implied contracts when it offered, and Plaintiff accepted, employment at UNC, and when Plaintiff performed for UNC.

426. UNC committed several breaches of its agreements with Plaintiff during the investigation and adjudication processes.

**Failure to Conduct a thorough and impartial investigation and adjudication process.**

427. Through the applicable policies, UNC agreed to: (i) conduct "a prompt, thorough, and impartial investigation, designed to provide a fair and reliable gathering of the facts by a trained and impartial investigator;" (ii) the University committed to conducting a prompt, thorough, and impartial resolution process; (iii) both the Title IX Policy and the PPDHRM assure that the University will "provide for the prompt and equitable" response to reports; and (iv) the University affirmed that the Title IX Coordinator, investigator(s), and any individuals designated by the University as a decision-maker in the formal resolution process, must not have a conflict of interest or bias for or against Reporting Parties or Responding Parties generally or an individual Reporting Party or Responding Party; must not rely on sex stereotypes; and must promote impartial investigations and adjudications of Formal Complaints of Sexual Harassment.

428. Each of the foregoing assurances were violated at every step of the process as described in detail above.

**Failure to presume Plaintiff not responsible**

429. Defendants also violated their conduct policies when they failed to presume Plaintiff not responsible for the reported conduct at all times during the process, until a determination regarding responsibility was made at the conclusion of the formal process.

430. Defendant Hall likewise engaged in actions that revealed her predetermined conclusion that Plaintiff was responsible for the alleged misconduct before the investigation process even began.

71

431. While acknowledging that the matters with Dr. Macy and Dr. Wretman did not arise out of the same facts and circumstances, she nonetheless requested that Plaintiff consider agreeing to a consolidated interviews without ever revealing that Dr. Wretman and Dr. Macy's matter were being handled under the same internal case number.

432. Ms. Hall presumed that a pattern of misconduct committed by Plaintiff would be revealed before the investigations had even gotten fully under way.

433. Defendant Hall in conjunction with Defendant Enlow decided early on, before any investigation had been undertaken by the EOC, that an email sent to a non-University Community member was a predicate for conjuring an artificial basis for jurisdiction under the umbrella policies of UNC and the UNC System.

### Deprivation of Plaintiff's right to cross-examine his accusers

434. At no time in the University Process was Plaintiff allowed to pose any questions to his accusers and upon information and belief, the University, through counsel, denied access to the recipient of the email in question.

435. Plaintiff was thus deprived of his right to question the other party, in direct violation of the applicable policy and due process.

436. In addition to the violations delineated above, UNC violated the covenant of good faith and fair dealing by failing to afford Plaintiff the fair, thorough, and impartial investigation processes to which he was entitled, resulting in an erroneous outcome and the final severe sanction of discharge.

437. North Carolina courts recognize an implied covenant of good faith and fair dealing in every contract, which mandates that neither party will do anything which injures the right of the other to receive the benefits of the agreement.

438.     Each of the foregoing breaches contributed to a process that deprived Plaintiff of his fundamental and contractually guaranteed rights, ultimately leading to adverse and erroneous findings against Plaintiff.

439.     As a proximate and foreseeable consequence of the foregoing breaches,

440.     Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss of education, loss of future career opportunities, reputational damage, economic injuries, and other direct and consequential damages.

441.     As a result of the foregoing, Plaintiff is entitled to damages in excess of $25,000 in an amount to be determined at trial, plus prejudgment interest, attorneys' fees expenses, costs and disbursements.

### FOURTH CLAIM FOR RELIEF - NEGLIGENT HIRING, SUPERVISION and RETENTION
### (Against University of North Carolina at Chapel Hill and Defendant Hall)

442.     Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

443.     At the time of the relevant events, UNC owed Plaintiff a duty to use care in the hiring, training, supervision, and retention of its personnel, including those employed by the EOC who were involved in the disciplinary investigations and adjudications of the cases against Plaintiff.

444.     In investigating the matters against Plaintiff and Dr. Macy, Defendant Enlow acted negligently when he conducted a procedurally defective and biased investigation process, designed to support his predetermined conclusion that Plaintiff was responsible for the alleged misconduct.

445.     Such negligence was exhibited by, for example including but not limited to: (i) Enlow posing leading questions to the complainants and witnesses in an effort to elicit certain

73

testimony and information, while repeatedly asking Plaintiff the same question in different ways, in an effort to catch him in inconsistencies; (ii) his failure to pursue material evidence referenced by the Plaintiff and speak to witnesses he provided; (iii) his multiple references within the investigation reports to other allegations brought against Plaintiff and Dr. Macy in the individual actions; (iv) his withholding of exculpatory evidence from Plaintiff, which he knowingly and intentionally excluded; (v) mischaracterizing the "evidence" in the report and to the Outcome Team.

446. Each of the foregoing demonstrated that Defendant Enlow was incompetent in his duties and should not have been serving as an EOC/Title IX investigator for the University.

447. Defendant Hall, as Defendant Enlow's supervisor, had actual or constructive notice of Defendant Enlow's actions described above, as she oversaw and was heavily involved in the investigation processes.

448. Further, Defendant Hall negligently supervised Defendant Enlow by failing to properly train him on how to conduct a fair and impartial investigation in compliance with the applicable University policies, failing to retrain him, and/or failing to terminate his employment despite her knowledge of the repeated demonstrations of bias committed by through the investigation of all the matters involving Plaintiff Dr. Wretman and Dr. Macy.

449. Defendant Enlow's ineptitude in conducting the investigations into Plaintiff Dr. Wretman and Dr. Macy proximately caused the harm Plaintiff suffered, namely discharge, as the University relied upon the Investigators' findings in reaching their final determinations of fact and in issuing sanctions commensurate with the findings.

450. UNC's decision to retain an Investigator with a track record of depriving accused students of a fair proceeding, was both negligent and reckless.

74

451.    Further, it was foreseeable that a negligently conducted disciplinary investigation would ultimately lead to incorrect findings, causing immense harm to the employee found responsible and consequently sanctioned.

452.    In committing the aforementioned acts or omissions, Defendant Hall and/or UNC negligently breached their duty to use due care, which directly and proximately resulted in the injuries and damages to Plaintiff as alleged herein.

453.    As a direct and foreseeable consequence of Defendants' conduct, Plaintiff has suffered irreparable injury to his reputation, loss of employment opportunities, loss of future earning capacity, and other economic and non-economic losses.

## FIFTH CLAIM FOR RELIEF – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Against the Individual Defendants)

454.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

455.    Defendants Guskiewicz, Barrett, Campbell, Clemens, Denby-Brinson, Enlow, Hall, Holmes, James-Whidbee, Mayfield, McAdoo, Wical and Chapman each carried out their duties with respect to the cases against Plaintiff in a negligent manner when, either acting individually or in concert, they permitted the reporting parties to weaponize UNC's processes against Plaintiff, engaged in decision-making calculated to lead to the predetermined conclusion that Plaintiff was responsible and must be punished severely, failed to ensure that the investigatory and adjudicatory processes were fair and objective, and instead contributed to the defective, prejudicial, and arbitrarily inequitable processes that were replete with gender bias against Plaintiff.

456.    By way of example but not limitation, Defendants: (i) presumed Plaintiff

responsible; (ii) deprived him of proper notice of the allegations; (iii) failed to disclose critical and exculpatory information at various junctures, until after the close of the proceedings in which Plaintiff could have used such information in his defense; (iv) permitted the inclusion of information concerning other allegations within each investigation report to ensure at least one finding of responsibility against Plaintiff was reached; (v) utilized the same two EOC Investigators for all matters involving Plaintiff and Dr. Macy further contributing to the biased nature of the proceedings; (vi) conducted investigations skewed in favor of the complainants and designed to reach predetermined findings of responsibility; and (vii) deprived Plaintiff of the opportunity to cross-examine his accusers.

457. In combination with conduct described above, the Defendants' actions evinced a malicious and corrupt intent and a pattern of extreme and outrageous behavior pursued with the intent to cause Plaintiff to suffer severe emotional distress.

458. Plaintiff has in fact suffered severe emotional distress as a proximate result of Defendants' actions. It was reasonably foreseeable that such negligent acts would result in severe emotional distress to Plaintiff, given the several year-long process that forced him to continuously defend himself, attempt to prove his innocence, face administrators that were not unbiased but instead presumed him to be responsible from the beginning and, despite all of his efforts, ultimately resulted in him being discharged from employment, ostracized from his collogues, removed from his esteemed position, and suffering from irreparable harm to his reputation.

459. Defendants' conduct will continue to cause harm to Plaintiff given the irreparable harm to his reputation, the interruption in his employment, and the lifelong consequences that flow therefrom.

460. It was reasonably foreseeable that Plaintiff would suffer emotional and

psychological harm as a result of Defendants' conduct.

461.    As a direct and foreseeable consequence of the foregoing conduct, Plaintiff has suffered, and will continue to suffer considerable emotional and psychological harm.

## SIXTH CLAIM FOR RELIEF – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against the Individual Defendants)

462.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

463.    Defendants Guskiewicz, Barrett, Campbell, Clemens, Denby-Brinson, Enlow, Hall, Holmes, James-Whidbee, Mayfield, McAdoo, Wical and Chapman each carried out their duties with respect to the cases against Plaintiff in a negligent manner when, either acting individually or in concert, they permitted the reporting parties to weaponize UNC's processes against Plaintiff, engaged in decision-making calculated to lead to the predetermined conclusion that Plaintiff was responsible and must be punished severely, failed to ensure that the investigatory and adjudicatory processes were fair and objective, and instead contributed to the defective, prejudicial, and arbitrarily inequitable processes that were replete with gender bias against Plaintiff.

464.    By way of example but not limitation, Defendants: (i) presumed Plaintiff responsible; (ii) deprived him of proper notice of the allegations; (iii) failed to disclose critical and exculpatory information at various junctures, until after the close of the proceedings in which Plaintiff could have used such information in his defense; (iv) permitted the inclusion of information concerning other allegations within each investigation report to ensure at least one finding of responsibility against Plaintiff was reached; (v) utilized the same two EOC Investigators for all matters involving Plaintiff and Dr. Macy further contributing to the biased

nature of the proceedings; (vi) conducted investigations skewed in favor of the complainants and designed to reach predetermined findings of responsibility; and (vii) deprived Plaintiff of the opportunity to cross-examine his accusers.

465.    The foregoing actions committed by the Individual Defendants as employees of the University, were so outrageous, so extreme in degree, and went beyond all bounds of decency, such that they were utterly intolerable.

466.    The actions of the Individual Defendants in their handling of the cases involving Plaintiff and Dr. Macy indicate either an intention to cause emotional distress to Plaintiff, or a reckless indifference to the high likelihood that such actions would cause severe emotional distress to Plaintiff, and such actions did directly cause severe emotional distress.

467.    In combination with conduct described above, the Defendants' actions evinced a malicious and corrupt intent and a pattern of extreme and outrageous behavior pursued with the intent to cause Plaintiff to suffer severe emotional distress.

468.    Defendants' conduct will continue to cause harm to Plaintiff given the irreparable harm to his reputation, the interruption in his education, and the lifelong consequences that flow therefrom.

469.    As a direct and foreseeable consequence of the foregoing conduct, Plaintiff has suffered, and will continue to suffer considerable emotional and psychological harm.

**SEVENTH CLAIM FOR RELIEF – VIOLATION OF STATE CONSTITUTION**
**(Against University of North Carolina at Chapel Hill)**

470.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

471.    UNC is an agency of the State of North Carolina and at all times relevant to this cause of action, UNC and its employees, agents, officers and directors were acting within the

78

course and scope of the authority, employment or agency conferred on them by UNC. As such, all of the conduct alleged herein is attributable to UNC and the State of North Carolina.

472.    The foregoing acts, omissions, agreements, and concerted conduct of Defendants directly and foreseeably caused the deprivations of the rights guaranteed to the Plaintiff by the North Carolina Constitution, including, but not limited to the following:

a.    Defendants' conduct deprived Plaintiff of the right to the fruits of his own labor in violation of Article I, Section 1;

b.    Defendants' conduct denied Plaintiff the equal protection of the laws in violation of Article I, Section 19; and

c.    Defendants' conduct violated Plaintiff's constitutional right not to be deprived of his liberties, privileges or property but by the law of the land, in violation of Article I, Section 19.

473.    As a direct and foreseeable result of the foregoing violations of Plaintiff's constitutional rights, Plaintiff has suffered the harms and damages alleged above in an amount to be determined by a jury.

474.    Plaintiff pleads this direct cause of action under the North Carolina Constitution in the alternative to Plaintiff's state-law claims should those causes of action be barred in whole or part or otherwise fail to provide a complete and adequate state law remedy for the wrongs committed by the Defendants and their agents and employees.

## EIGHTH CLAIM FOR RELIEF – CIVIL CONSPIRACY
### (All Defendants)

475.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

476.    Defendants at some point were all aware of the baseless allegations against Plaintiff Dr. Wretman and Dr. Macy and despite that knowledge set out on a course of conduct designed to result in the discharge of Dr. Wretman from his employment at the University of North Carolina at Chapel Hill.

477.    This conspiracy has resulted in an injury to Dr. Wretman in an amount in excess of $25,000.

478.    As a result of this civil conspiracy Defendants shall be jointly and severally liable for all damages therefrom.

## NINTH CLAIM FOR RELIEF – PUNITIVE DAMAGES
### (All Defendants)

479.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

480.    Defendants intentionally, wantonly, with planning and intent set out upon plan to discharge Plaintiff prior to investigating or determining facts.

481.    Defendants then together intentionally, wantonly, with planning and intent set out discharge Plaintiff without regard to the truth of the allegations against him.

482.    The actions of Defendants represent willful and wanton conduct with conscious and intentional disregard for Plaintiff and Defendants knew or should have known his conduct was reasonably likely to result in injury, damages, or other harm.

483. As a direct and proximate result of Defendants willful, wanton, reckless and intentional conduct as set forth here, Plaintiff suffered severe emotional distress and financial loss.

484. As a direct and proximate result of Defendants' willful, wanton, reckless and intentional conduct Plaintiff is entitled to recover punitive damages from Defendants.

**WHEREFORE**, Plaintiff Christopher J. Wretman prays the Court as follows:

1. That the Plaintiff have and recover of Defendants a sum in excess of Twenty-Five Thousand Dollars ($25,000.00);

2. That the Plaintiff have and recover of Defendants, for punitive damages, a sum in excess or Twenty-Five Thousand Dollars ($25,000.00);

3. That Plaintiff have and recover of Defendants, interest at the legal rate on any judgment from the date of the institution of this action, as provided by N.C.G.S. §§ 24-1 and 24-5;

4. That the costs of this action be taxed against the Defendants including reasonable attorneys' fees;

5. That all issue of fact be tried by a jury; and

6. For such and other relief as the Court deems just and proper.

This is the 15th day of February , 2023.

Matthew C. Suczynski
Michael R. Paduchowski
Ray J. Griffis, Jr.
Attorneys for Plaintiff
Law Office of Matthew Charles Suczynski, PLLC
208 North Columbia Street
Chapel Hill, NC 27514
T: (919) 619-3242
F: (919) 869-2036
attorneys@matthewcharleslaw.com

Case 1:24-cv-00233-TDS-JLW   Document 1-3   Filed 03/15/24   Page 81 of 82

NORTH CAROLINA

COUNTY OF ORANGE

## VERIFICATION

Christopher John Wretman, being first and duly sworn, deposes and says that he has read the foregoing Complaint, and knows the contents thereof; and that the same is true of his own knowledge, except as to such matters therein stated upon information and belief, and as to those matters he believes to be true.

_____
Christopher John Wretman

Sworn to and subscribed before me
this 14TH day of February, 2024.

_____
Notary Public
My Commission Expires: LIFETIME.

**Donald Wright, Notary Public**
**1 Walker Street**
**Edinburgh, UK**
**www.notary.scot**