```
              IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


CHRISTOPHER J. WRETMAN,          )
                                 )
               Plaintiff,        )
                                 )
     v.                          )
                                 )
THE UNIVERSITY OF NORTH          )
CAROLINA SYSTEM; THE UNIVERSITY )
OF NORTH CAROLINA AT CHAPEL      )
HILL; THE UNIVERSITY OF NORTH    )
CAROLINA BOARD OF TRUSTEES;      )
BOARD OF GOVERNORS THE           )
UNIVERSITY OF NORTH CAROLINA     )
AT CHAPEL HILL; LEE ROBERTS, in )
his official capacity; KEVIN     )        1:24-cv-233
M. GUSKIEWICZ, individually;     )
JEFFREY CAMPBELL, individually   )
and in his official capacity;    )
J. CHRISTOPHER CLEMENS,          )
individually and in his official)
capacity; JEREMY ENLOW,          )
individually and in his official)
capacity; C. ELIZABETH HALL,     )
individually and in her official)
capacity; G. MARK HOLMES,        )
individually and in his official)
capacity; DONNA JAMES-WHIDBEE, )
individually and in her official)
capacity; T. ADELE MAYFIELD,    )
individually and in her official)
capacity; ANGENETTE MCADOO,     )
individually and in her official)
capacity; LORA WICAL,            )
individually and in her official)
capacity; MARGARET BARRETT,     )
individually and in her official)
capacity; MIMI V. CHAPMAN,      )
individually and in her official)
capacity; and RAMONA            )
DENBY-BRINSON, individually and )
```

in her official capacity;          )
                                   )
                    Defendants.    )

**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

Plaintiff filed a complaint asserting claims for relief arising from his discharge for-cause in May 2022 against the University of North Carolina at Chapel Hill ("UNC-CH") and its constituent institutions and various UNC-CH employees. (See generally Compl. (Doc. 4).) Before this court are motions to dismiss filed by the UNC Defendants, (Doc. 13), and the Individual Defendants, (Doc. 15). The motions are fully briefed and ripe. A hearing is not necessary to resolve the motion. For the reasons that follow, both motions will be granted in part and denied in part.

**I.    FACTUAL BACKGROUND**

On a motion to dismiss, a court must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." Ray v. Roane, 948 F.3d 222, 226 (4th Cir. 2020) (citation omitted). The facts, as provided in the complaint, are as follows.

**A.    Plaintiff's Employment at UNC-CH**

In August 2017, Plaintiff Christopher James Wretman ("Plaintiff" or "Wretman") was hired as a "Senior Data Analyst"

- 2 -

for the Sheps Center at UNC-CH. (Compl. (Doc. 4) ¶ 25.) His position was "designated as permanent Exempt from the North Carolina Human Resources Act (EHRA) Non-Faculty Research Staff." (Id. ¶ 28.) The position was "funded at 75% 'full time equivalent'" and Plaintiff was encouraged to "fill his remaining 25% . . . by seeking additional duties at UNC-CH." (Id. ¶ 30.) Plaintiff's additional duties included "work[ing] with other UNC-CH faculty on research projects." (Id. ¶ 31.)

Plaintiff joined a collaborative, but informal, research team comprised of himself, Dr. Rebecca Macy and Dr. Cynthia Rizo, UNC-CH faculty members, Dr. Jeongsuk Kim, a postdoctoral scholar, and Ms. Jia Luo, a Research Program Manager. (Id. ¶¶ 36, 44, 50, 53.) The research team collaborated with other faculty and students in the UNC-CH School of Social Work ("SSW"), including Ms. Sarah Godoy, a doctoral student, and Ms. Erin Meehan, a master's student. (Id. ¶ 54.)

B.  **Reports of Plaintiff's Misconduct**

Between April and June of 2021, both Godoy and Luo expressed concerns about the dynamics of the informal research team. First, on April 1, 2021, Godoy met with Mimi Chapman, the Associate Dean for Doctoral Education in the SSW, and "expressed concerns about communication with her informal research team, led by Macy, Rizo, and [Plaintiff]." (Id. ¶¶ 19, 82.) Chapman

- 3 -

"initiated follow-up conversations . . . about Godoy's concerns"
and thereafter "made a Report to the EOC/Title IX Office." (Id.
¶¶ 83, 85.)[1] Chapman also arranged meetings with Macy and Rizo,
on May 10, and Plaintiff, on May 13. (Id. ¶¶ 86, 94.) During the
meeting with Macy and Rizo, Chapman relayed that Godoy "reported
that the team dynamics, particularly the team's close
relationships, made her uncomfortable" and that "Wretman made
inappropriate comments." (Id. ¶ 95.)

Second, on June 3, 2021, Luo "met with Macy to raise
concerns about the research team and its functioning." (Id. ¶
116.) Luo "made allegations against the team and Wretman
concerning anti-Asian hate, harassment, and a toxic work
environment" and "declared that Wretman's communication style
was particularly a problem for her." (Id. ¶ 117.) Additionally,
Luo "indicated to Macy that she knew of others with concerns
about Wretman." (Id. ¶ 118.) Following this meeting, on June 4,
2021, Macy "reported Luo's concerns about herself, Rizo, and
Wretman to EOC." (Id. ¶ 121.) Macy also informed Plaintiff "that

---

[1] "The UNC-CH Equal Opportunity and Compliance Office (EOC)
is the sole formal entity at UNC-CH charged with investigating
Reports of Discrimination and Harassment under its policies,
which include the Policy Prohibiting Discrimination, Harassment,
and Related Misconduct (hereafter PPDHRM)." (Compl. (Doc. 4) ¶
75.)

- 4 -

Luo was raising concerns" and "indicated to him that others may have concerns too." (Id. ¶ 124.)

Also on June 4, 2021, Plaintiff sent an email to Meehan – who had recently completed an internship with Macy – with the subject line "Rescinding Offer of Help." (Id. ¶¶ 141–142.) In its entirety, the email stated: "I am writing to formally rescind any offer I have made to help you at PCANC [Prevent Child Abuse North Carolina], offer you a job reference, help you apply to a PhD program, help you with any written work, or to help you in any other manner. Please do not contact me going forwards." (Id. ¶ 143.) Following this email, Meehan reported Plaintiff to the EOC "on or about November 11, 2021." (Id. ¶ 146.)

C.  **Assessment of Reports and Notices of Investigation**

After Godoy, Luo, and Meehan reported misconduct in April, June, and November of 2021, respectively, the EOC's first step was "to conduct an Initial Assessment of such Reports to determine whether the alleged conduct would present a violation of [UNC-CH] Policy and whether further action [was] warranted based on the alleged conduct." (Id. ¶ 154.) The EOC conducted

- 5 -

its initial assessment of the reports between April 2021 and March 2022. (Id. at 27.)[2]

After the EOC completed its initial assessment, it issued a Notice of Investigation ("NOI") to Plaintiff on November 23, 2021, regarding Luo's report, an NOI to Plaintiff on December 13, 2021, regarding Meehan's report, and an NOI to Plaintiff on March 9, 2022, regarding Godoy's report. (Id. ¶¶ 155, 188, 193.) With respect to the Luo and Godoy reports, the NOIs informed Plaintiff that he was under investigation for possible violations of UNC-CH's "Hostile Environment Harassment" policy and UNC-CH's "Bullying policy under its Workplace Violence Policy." (Id. ¶¶ 175, 179, 204-05, 209.) With respect to the Meehan report, the NOI informed Plaintiff he was under investigation for possible violations of UNC-CH's "PPDHRM Retaliation Policy." (Id. ¶ 189.) The NOIs also detailed the allegations made by Godoy, Luo, and Meehan that gave rise to each of the investigations. (See id. ¶¶ 176, 180, 191, 206, 210.)

---

[2] Citations in this Memorandum Opinion and Order to documents filed within the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

**D.   Investigation and Findings**

The EOC conducted its formal investigations into the
bullying, harassment, and retaliation charges between November
2021 and May 2022. (Id. at 37.) The investigations were led by
Jeremy Enlow and Donna James-Whidbee. (Id. ¶¶ 11, 14, 214.) The
investigators interviewed Plaintiff, (id. ¶¶ 233–35), the
reporting parties, (id. ¶¶ 220, 222), and various witnesses,
(id. ¶ 237).

UNC-CH's PPDHRM Procedures Policy provides that "upon
completion of an Investigation, an initial version of an
Investigation Reports [sic] is sent to the Administrative
Adviser for review. Following such a review, an Outcome Team is
then gathered to determine a course of actions based on the
Findings as well as other relevant information." (Id. ¶ 238.)
"Sometime in April 2022, Enlow and James-Whidbee finalized their
Investigation Report concerning [Plaintiff] and submitted it to
[(Ramona)] Denby-Brinson for review." (Id. ¶¶ 10, 240.)
Plaintiff alleges, upon information and belief, that the Outcome
Team met in late April 2022. (Id. ¶ 243.) On May 6, 2022,
Plaintiff received an email notification detailing the Outcome
Team's findings. (Id. ¶ 247.)

The Outcome Team "determined there was insufficient
evidence to conclude that [Plaintiff] had violated the

University's policies concerning Harassment and Bullying." (Id.)
However, the Outcome Team found "there was a preponderance of
evidence indicating that [Plaintiff] had violated the
University's policy against Retaliation per Meehan's allegations
and Report." (Id. ¶ 248.)

### E. Outcome Process and Discharge

After the EOC announced its findings, G. Mark Holmes,
Director of the Sheps Center at UNC-CH, contacted Plaintiff by
email and indicated "that he was initiating a process to
discharge [Plaintiff] from his employment at UNC-CH for cause
based on the EOC Investigation Report and the finding that
[Plaintiff] violated the UNC-CH Retaliation policy." (Id. ¶¶ 13,
273.) As part of Plaintiff's "outcome resolution process," (id.
¶ 274), he attended a "Pre-Discharge Conference" with Holmes and
Ms. Angenette McAdoo, Senior Director in Employee Management
Relations at UNC-CH, (id. ¶ 275). This conference consisted of
two, 45-minute meetings held on May 9 and May 12, 2022,
respectively, during which "Holmes and McAdoo ask[ed]
[Plaintiff] questions about his email to Meehan, Meehan herself,
and [Plaintiff's] relationship with Meehan." (Id. ¶¶ 275, 278.)
Holmes also sought "review and approval" of his decision to
discharge Plaintiff from UNC-CH's Provost, J. Christopher
Clemens. (Id. ¶ 281.)

On May 23, 2022, Plaintiff met with Holmes again via Zoom, during which time Holmes informed Plaintiff "verbally that he had made the decision to Discharge Wretman." (Id. ¶ 282.) Holmes followed up by "deliver[ing] his Discharge for Cause decision to [Plaintiff] in a letter." (Id. ¶ 283.) Plaintiff alleges that he was "not given an opportunity to respond and offer any explanation, verbally and/or in writing as to why he believed that he should not be discharged." (Id. ¶ 289.) Plaintiff further contends that the decision to discharge contained "factual errors about the EOC Investigations," (id. ¶ 290), and no "support[] [for] how and why Holmes arrived at his rationale for Discharge," (id. ¶ 292).

### F. **Post-Discharge Appeal**

After Plaintiff was discharged on May 23, 2022, he began an appeal process "which entailed four phases and lasted nearly a full calendar year." (Id. ¶ 295.) First, Plaintiff submitted a written grievance on June 6, 2022, (id. ¶¶ 297-98), in which he challenged the EOC's determination that he violated UNC-CH's retaliation policy when he emailed Meehan and rescinded his offer to help her, (id. ¶¶ 299-300), as well as Holmes' decision to discharge him for cause, (id. ¶ 301). Elizabeth Hall, Vice Chancellor of the EOC, responded on July 18, 2022, denying Plaintiff's written grievance and "reiterat[ing] the . . .

analysis presented by Enlow and James-Whidbee in their Investigation Report." (<u>Id.</u> ¶¶ 12, 303-04.)

Second, Plaintiff was afforded a hearing on August 30, 2022, before a three-person panel of UNC-CH employees. (<u>Id.</u> ¶ 311.) Plaintiff and his attorney were provided 90 minutes to present his case, and the hearing lasted four hours in total. (<u>Id.</u> ¶¶ 315, 319.) Plaintiff's presentation included an opening statement, interviews with witnesses, Plaintiff's testimony, and a closing statement. (<u>Id.</u> ¶ 319.) Plaintiff additionally sought to submit twelve letters of support from colleagues, but his request was denied. (<u>Id.</u> ¶ 317.) After the hearing, the panel deliberated, consulted with a UNC-CH attorney, and announced their initial determination that Plaintiff had not "made an initial case for his [a]ppeal." (<u>Id.</u> ¶¶ 320-21.) The panel provided Plaintiff with a written report on September 27, 2022, confirming their decision. (<u>Id.</u> ¶¶ 323-24.)

Third, on October 7, 2022, Plaintiff submitted an appeal to UNC-CH's Chancellor, Kevin Guskiewicz. (<u>Id.</u> ¶ 329.) Guskiewicz denied Plaintiff's appeal in December 2022. (<u>Id.</u> ¶ 336.)

Fourth, Plaintiff submitted his appeal to the UNC-CH Board of Trustees ("BOT") on December 23, 2022. (<u>Id.</u> ¶ 340.) A three-member panel of the BOT reviewed Plaintiff's appeal, (<u>id.</u> ¶

342), and in an 2-1 vote, delivered on May 13, 2023, "upheld the University's decision to Discharge" Plaintiff, (id. ¶ 350).

## G. **Exhaustion of Administrative Avenues**

After exhausting his administrative remedies "within UNC-CH," Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and the U.S. Department of Education's Office of Civil Rights ("OCR"). (Id. ¶ 361.) The EEOC and OCR ruled that they would not pursue an investigation against UNC-CH, "thus providing [Plaintiff] the right to pursue individual legal action against UNC-CH within [a] 90-day timeline." (Id. ¶¶ 362-63.)

Additional facts will be raised and addressed as necessary in the analysis to follow.

## II. **PROCEDURAL HISTORY**

Plaintiff filed a complaint in the Orange County Superior Court on February 15, 2024, and Defendants removed the case to this court on March 15, 2024. (See Notice of Removal (Doc. 1); Compl. (Doc. 4).) Plaintiff asserts federal claims under Title IX and 42 U.S.C. § 1983, (Compl. (Doc. 4) at 61, 65), which are before this court pursuant to federal question jurisdiction, 28 U.S.C. § 1331, (Notice of Removal (Doc. 1) at 3). Plaintiff additionally asserts several state law claims, (Compl. (Doc. 4) at 70, 73, 75, 77, 78, 80), which are before this court pursuant

to supplemental jurisdiction, 28 U.S.C. § 1367(a), (Notice of Removal (Doc. 1) at 3 n.2).

On June 3, 2024, the University of North Carolina at Chapel Hill ("UNC-CH"), the University of North Carolina System ("UNC System"), and the improperly named[3] UNC System Board of Trustees and UNC-CH Board of Governors (collectively, the "UNC Defendants") filed UNC Defendants' Motion to Dismiss, (Doc. 13),[4] seeking to dismiss all claims alleged against them, (id. at 1). The UNC Defendants filed a memorandum in support of their motion. (UNC Defs.' Br. in Supp. of Mot. to Dismiss ("UNC Defs.'

---

[3] Defendants explain: "The UNC System does not have a Board of Trustees; it has a Board of Governors. N.C. Gen. Stat. §116-2. UNC-CH does not have a Board of Governors; it has a Board of Trustees. Id." (Doc. 13 at 1 n.1.)

[4] The UNC Defendants publicly filed their Motion to Dismiss, (Doc. 13), with redacted exhibits, (see Docs. 13-1 through 13-12). The UNC Defendants also filed a copy of their Motion to Dismiss, as well as unredacted exhibits, under seal. (See Doc. 18; Docs. 18-1 through 18-12.) This court issued an Order on March 31, 2025, granting UNC Defendants' motion to seal Document 18 and its unredacted exhibits.

The UNC Defendants argue that this court may consider these exhibits in deciding the operative motion, citing to caselaw from the Middle District of North Carolina and from the Fourth Circuit. (See Doc. 13 at 5–7; Doc. 18 at 5–7.) As discussed later in this memorandum opinion, Plaintiff has failed to state a plausible claim for relief as to his federal claims even without consideration of Defendants' exhibits, and thus, this court need not decide whether it has the authority to do so.

Br.") (Doc. 20).)[5] On July 24, 2024, Plaintiff responded in opposition, (Pl. Christopher Wretman's Mem. of Law in Opp'n to the UNC Defs. Mot. to Dismiss ("Pl.'s Resp. to UNC Defs.") (Doc. 23)), and on August 22, 2024, the UNC Defendants replied, (UNC Defs.' Reply Br. in Supp. of Mot. to Dismiss ("UNC Defs.' Reply") (Doc. 26)).

On June 3, 2024, Defendants Lee H. Roberts, Kevin M. Guskiewicz, Jeffrey Campbell, J. Christopher Clemens, Ramona Denby-Brinson, Jeremy Enlow, C. Elizabeth Hall, G. Mark Holmes, Donna James-Whidbee, T. Adele Mayfield, Angenette McAdoo, Lora Wical, Margaret Barrett, and Mimi V. Chapman (collectively, the "Individual Defendants") filed Individual Defendants' Motion to Dismiss, (Doc. 15), seeking to dismiss all claims alleged against them, (id. at 1). On the same date, the Individual Defendants filed a memorandum in support of their motion. (Individual Defs.' Mem. of Law in Supp. of Mot. to Dismiss ("Individual Defs.' Br.") (Doc. 16).) On July 24, 2024, Plaintiff responded in opposition, (Pl. Christopher Wretman's Mem. of Law in Opp'n to the Individual Defs. Mot. to Dismiss ("Pl's Resp. to Individual Defs.") (Doc. 24)), and on August 22,

---

[5] Throughout this Memorandum Opinion and Order, this court cites to the UNC Defendants' sealed brief in support of their motion to dismiss. (UNC Defs.' Br. (Doc. 20).) The public, unsealed brief can be found at CM/ECF Docket Entry 14.

2024, the Individual Defendants replied, (Individual Defs.'
Reply Br. in Supp. of Mot. to Dismiss ("Individual Defs.'
Reply") (Doc. 27)).

## III. **STANDARD OF REVIEW**

To survive a Rule 12(b)(6) motion to dismiss, "a complaint
must contain sufficient factual matter, accepted as true, to
'state a claim to relief that is plausible on its face.'"
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl.
Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is
plausible on its face if the plaintiff pleads "factual content
that allows the court to draw the reasonable inference that the
defendant is liable" and demonstrates "more than a sheer
possibility that a defendant has acted unlawfully." Id. (citing
Twombly, 550 U.S. at 556–57).

When ruling on a motion to dismiss, this court accepts the
complaint's factual allegations as true. Id. Further, in
construing the complaint, this court "draw[s] all reasonable
inferences in favor of the plaintiff." See M.P. by & through
Pinckney v. Meta Platforms Inc., 127 F.4th 516, 522–23 (4th Cir.
2025). This court does not, however, accept legal conclusions as
true, and "[t]hreadbare recitals of the elements of a cause of
action, supported by mere conclusory statements, do not
suffice." Iqbal, 556 U.S. at 678.

IV.  **ANALYSIS**

A. **Exhaustion of Administrative Remedies**

As a threshold matter, all Defendants contend that Plaintiff failed to "file a petition for judicial review under the North Carolina Administrative Procedures Act ('APA')" after he completed his four-step appeals process within UNC-CH. (See UNC Defs.' Br. (Doc. 20) at 4; see also Individual Defs.' Br. (Doc. 16) at 13.) The North Carolina Administrative Procedure Act provides: "Any party or person aggrieved by the final decision in a contested case, and who has exhausted all administrative remedies made available to the party or person aggrieved by statute or agency rule, is entitled to judicial review of the decision under this Article." See N.C. Gen. Stat. § 150B-43. Thereafter, Section 150B-45 provides:

> [T]he person seeking review must file a petition in superior court within 30 days after the person is served with a written copy of the decision. A person that fails to file a petition within the required time waives the right to judicial review under this Article. For good cause shown, however, the superior court may accept an untimely petition.

Id. § 150B-45(a).

After the Board of Trustees denied Plaintiff's appeal, which was Plaintiff's final administrative remedy "within UNC-CH," (see Compl. (Doc. 4) ¶¶ 350, 361), Defendants argue that Plaintiff "did not file a petition for judicial review" as

- 15 -

prescribed by N.C. Gen. Stat. § 150B-45(a), (UNC Defs.' Br.
(Doc. 20) at 4, 13; Individual Defs.' Br. (Doc. 16) at 13).
Defendants contend that Plaintiff's failure to file a petition
for judicial review means: (1) he is barred from pursuing his
state law claims in this court due to failure to exhaust
administrative remedies; and (2) collateral estoppel precludes
Plaintiff from relitigating the issues underlying his Title IX
and § 1983 claims because UNC-CH's administrative decision
stands as a final decision on the merits. (See UNC Defs.' Br.
(Doc. 20) at 15-19; Individual Defs.' Br. (Doc. 16) at 12-13.)

In response, Plaintiff argues that collateral estoppel does
not preclude his Title IX and § 1983 claims because the elements
of those claims "are not identical" to the issues decided by
UNC-CH through the administrative appeals process. (Pl.'s Resp.
to UNC Defs. (Doc. 23) at 12.) He additionally argues that,
after the BOT denied his appeal, he "filed a timely Complaint
with the Equal Opportunity and Employment Commission (EEOC) and
Office of Civil Rights (OCR)" and "the EEOC and OCR provided
[him] the right to pursue legal action against the Defendants
which he did in a timely fashion." (Id. at 11-12.) Finally, he
argues that this court "has the authority to find that good
cause exists to allow for Judicial Review at this point." (Id.
at 17.)

This court need not resolve these arguments. Assuming, without deciding, that Plaintiff's Title IX and § 1983 claims are not precluded by collateral estoppel, Plaintiff has nonetheless failed to state a plausible claim for relief as to either claim. As discussed below, Plaintiff's Title IX and § 1983 claims will be dismissed with prejudice. This court will decline supplemental jurisdiction over Plaintiff's state law claims, remanding those claims to the Orange County Superior Court for further proceedings therein.

**B. <u>Title IX Claim (UNC Defendants)</u>**

Plaintiff brings a Title IX claim against UNC-CH, alleging that "Defendant [UNC-CH] discriminated against Plaintiff . . . because of his sex by applying an unfair, unreliable, and partial process against him in resolving the complaints against him." (Compl. (Doc. 4) ¶ 376.)

"Title IX prohibits federally-supported educational institutions from practicing discrimination on the basis of sex . . . [and] is enforceable through an implied private right of action." <u>Sheppard v. Visitors of Va. State Univ.</u>, 993 F.3d 230, 234–35 (4th Cir. 2021) (citations omitted). The inquiry before this court is whether "the alleged facts, if true, raise a plausible inference that [UNC] discriminated against [Plaintiff] on the basis of sex." <u>Id.</u> at 235 (citation omitted). To raise a

- 17 -

plausible inference of discrimination "on the basis of sex," Plaintiff must allege "but-for" causation between his sex and the university's disciplinary proceeding. See id. at 236.

The UNC Defendants offer several arguments why Plaintiff's complaint fails to establish a plausible "but-for" causal link between his sex and the disciplinary proceeding, among them that Plaintiff's "conclusory allegations of gender bias are insufficient" and that "many of the policy violations [Plaintiff] alleges are not, in fact, policy violations or reflect a fundamental misunderstanding of UNC-CH's policies and Title IX." (See UNC Defs.' Br. (Doc. 20) at 21-23.) Plaintiff responds by citing to a sole allegation in his complaint: his allegation that Mr. Eric Quimbaya-Winship, a Deputy Title IX Coordinator at UNC-CH, "explicated that Wretman needed to comport himself more appropriately as a straight White male." (Compl. (Doc. 4) ¶¶ 100-01.) Plaintiff argues that "[t]his allegation alone and Wretman's subsequent discharge are significantly plausible allegations that support his Title IX claim." (Pl.'s Resp. to UNC Defs. (Doc. 23) at 13-14). This court disagrees.

Plaintiff alleges that Quimbaya-Winship made this comment during a meeting on May 13, 2021, (see Compl. (Doc. 4) ¶¶ 94, 100-01), one and a half months after Godoy first reported

- 18 -

concerns about Wretman's behavior to Chapman, (id. ¶ 82), but roughly six months before the commencement of "EOC's formal Investigations of Wretman," (id. ¶ 214). The EOC investigations that commenced six months after this meeting "were largely conducted by Enlow and James-Whidbee," not by Quimbaya-Winship. (Id. ¶¶ 214, 220.) In fact, Plaintiff does not allege that Quimbaya-Winship played any role in the investigation of Plaintiff, (id. ¶¶ 214-37), in reviewing the investigation reports, (id. ¶¶ 238-46), in determining findings and outcomes, (id. ¶¶ 247-72), in conducting Plaintiff's discharge proceedings, (id. ¶¶ 273-94), or in adjudicating his appeals, (id. ¶¶ 295-352).

The Fourth Circuit cautions that "[d]etermining the actual decisionmaker responsible for the adverse employment action can be paramount to determining whether the protected trait played a role in the decision." Ousley v. McDonald, 648 F. App'x 346, 348 (4th Cir. 2016).[6] Even drawing inferences in Plaintiff's favor

---

[6] Although Ousley is a Title VII employment discrimination case, "generally speaking, Title IX employment discrimination claims are subject to the same analysis as employment discrimination claims brought under Title VII of the Civil Rights Act of 1964." Reid v. James Madison Univ., 90 F.4th 311, 319 (4th Cir. 2024) (analyzing the issue of accrual); see also Preston v. Commonwealth of Va. ex rel. New River Cmty. Coll., 31 F.3d 203, 207 (4th Cir. 1994) ("We agree that Title VII, and the judicial interpretations of it, provide a persuasive body of standards to which we may look in shaping the contours of a private right of action under Title IX.").

that Quimbaya-Winship's comment evinced his own sex-based bias toward Plaintiff, there is no plausible linkage between this isolated comment – asserted by a UNC employee who took no part in the investigation or adjudication of the claims against Plaintiff, six months before the investigation commenced – to "the university's challenged disciplinary proceeding." See Sheppard, 993 F.3d at 236. At bottom, Plaintiff's allegation about Quimbaya-Winship's comment does not support the plausible inference that he was discharged on the basis of his sex in violation of Title IX.

Although Plaintiff advances no other argument in his response brief to support his contention that gender was a "but-for" cause of his discharge, (see Pl.'s Resp. to UNC Defs. (Doc. 23) at 13–14)), elsewhere in his brief he notes that his complaint raised gender "on no fewer than five occasions," (id. at 13 (citing Compl. (Doc. 4) ¶¶ 101, 105, 183, 213, 328)). One of these "occasions" is the Quimbaya-Winship comment discussed supra. In three of the other paragraphs that Plaintiff cites, he repeats allegations that Godoy and Luo, two of the reporting parties, had concerns about the research team's "communications and dynamics" and yet Plaintiff, "the only male on the team," was the one "investigated for Bullying and Harassment" by the EOC, which "indicat[es] that EOC discriminated against [him]

based on his sex." (Pl.'s Resp. to UNC Defs. (Doc. 23) at 13; Compl. (Doc. 4) ¶¶ 105, 182-83, 213.)

These allegations do not plausibly allege discrimination on the basis of sex for several reasons. One, even accepting as true Plaintiff's allegation that Godoy and Luo expressed concerns about the "communications and dynamics" of the research team as a whole, (see Compl. (Doc. 4) ¶¶ 105, 182-83, 213), there is no basis for this court to reasonably infer that generalized concerns about a team's "communications and dynamics" warranted an EOC investigation against every member of the team.[7] This is especially true where, as here, according to Plaintiff's allegations, Godoy and Luo reported a number of additional grievances particularized to Plaintiff, alongside their generalized concerns about the team.

For example, Plaintiff alleges that "Godoy reported that the team dynamics, particularly the team's close relationships, made her uncomfortable" but that it was Wretman who "made inappropriate comments." (Id. ¶ 95.) Plaintiff acknowledges that he "had seemingly been the focus" of Godoy's report to the EOC. (Id. ¶ 90.) Likewise, although Plaintiff alleges that Luo "made

---

[7] Plaintiff does not explain in his complaint or briefing how generalized concerns about a team's interpersonal dynamics amount to a possible violation of UNC-CH's PPDHRM. See supra n.1.

- 21 -

allegations against the team and Wretman concerning anti-Asian hate, harassment, and a toxic work environment," she specifically "declared that Wretman's communication style was particularly a problem for her." (Id. ¶ 117 (emphasis added).) Luo also communicated "that she knew of others with concerns about Wretman." (Id. ¶ 118 (emphasis added).) The presence of these particularized accusations levied against Plaintiff, alongside generalized concerns about the team, undercuts any reasonable inference that Plaintiff was "similarly situated" to his team members and singled out by the EOC because of his sex. See Sheppard, 993 F.3d at 237.

Two, notwithstanding Plaintiff's contention that he was singled out for investigation as "the only male member on the team," he alleges in the complaint that at least one other member of the research team – Dr. Rebecca Macy – was investigated by the EOC. After Godoy reported "concerns about communication with her informal research team" to Chapman on April 1, 2021, (id. ¶ 82), Chapman organized an initial meeting with Plaintiff on May 13, 2021, and with Macy on May 10, 2021, (see id. ¶ 94). Plaintiff's complaint asserts few details about what became of the probe into Macy's conduct but acknowledges that the EOC "was conducting" an investigation of Macy, and that this investigation was eventually combined with the

investigation against Plaintiff. (See id. ¶ 219.) These
allegations further undermine any inference that Plaintiff was
singled out for investigation as the only male member of the
team.

In the fifth paragraph Plaintiff cites in his response
brief, Plaintiff alleges that G. Mark Holmes, the Director of
the Sheps Center at UNC-CH, made comments "replete with sex-
based stereotypes" while explaining his decision to discharge
Plaintiff. (Compl. (Doc. 4) ¶ 328.) Specifically, Plaintiff
alleges:

> [I]n his Hearing testimony, Holmes indicated that he
> made his decision to Discharge Wretman based on sex-
> based stereotypes. Specifically, Holmes stated that,
> when considering how to discipline Wretman, Holmes
> considered that based on Wretman's adjudicated conduct,
> he believed that Wretman would need to be monitored
> around colleagues and students, most of whom were
> female. The idea that males are dangerous and must be
> monitored around females is replete with sex-based
> stereotypes, thus making Wretman's Discharge decision
> highly subjective. Holmes went on to state that because
> [sic] ensuring that Wretman would be monitored would be
> logistically difficult. Thus, Holmes, continued that he
> felt that he had no choice but to choose Discharge over
> a lesser punishment. In sum, Holmes [sic] perceptions of
> Wretman vis-à-vis the need for monitoring around
> colleagues and students, who were mostly female, was the
> deciding factor for his selection of Discharge.

(Id.)

This court is required to accept well-pleaded facts as
true, but mere conclusions "are not entitled to the assumption
of truth." Iqbal, 556 U.S. at 679. This court accepts as a well-

pleaded fact that Holmes expressed: "[B]ased on Wretman's adjudicated conduct, he believed that Wretman would need to be monitored around colleagues and students, most of whom were women." (Compl. (Doc. 4) ¶ 328 (emphasis added).) It further accepts that Holmes expressed: "[B]ecause ensuring that Wretman would be monitored would be logistically difficult . . . he felt that he had no choice but to choose Discharge over a lesser punishment." (Id. (emphasis added).) However, Plaintiff's allegation that Holmes "indicated that he made his decision to Discharge Wretman based on sex-based stereotypes," that is, "[t]he idea that males are dangerous and must be monitored around females," (id.), appears to be an editorialized conclusion, and is not plausibly supported by well-pleaded facts, see Iqbal, 556 U.S. at 679. Plaintiff's well-pleaded facts suggest, instead, that Holmes considered Plaintiff's adjudicated conduct - not the stereotypical conduct of all males - and decided that Plaintiff needed to be monitored. Plaintiff may disagree with Holmes' conclusion that Plaintiff required monitoring, as well as Holmes' rationale that Plaintiff's

adjudicated conduct required discharge,[8] but this court detects no plausible inference of sex-based bias in those decisions.

Finally, none of Plaintiff's other allegations, beyond those he cites in his brief, (see Pl.'s Resp. to UNC Defs. (Doc. 23) at 13-14), support a reasonable inference that he faced sex-based discrimination during his EOC investigation, outcome

---

[8] As Plaintiff points out in his complaint, one member of the Board of Trustees' panel did disagree with Holmes' conclusion and rationale. That trustee, unlike the other two members of the panel, voted against upholding Plaintiff's discharge, because "he did not believe the record evidence showed that in reaching the decision to discharge Dr. Wretman, the University adequately considered the effectiveness of the other potential disciplinary options available under University policy." (Compl. (Doc. 4) ¶ 352.) This allegation demonstrates that there are multiple reasonable viewpoints as to the propriety of a university administrator's discretion-laden decision to discharge an employee for cause, but it does not demonstrate that the decision to discharge Plaintiff was because of his sex.

process, or post-discharge appeal.[9] Accordingly, Plaintiff has

failed to state a plausible claim for relief and the UNC

Defendants' motion to dismiss will be granted as to the Title IX

claim.

## C. **42 U.S.C. § 1983 - Fourteenth Amendment Due Process Claim**

### **(UNC Defendants and Individual Defendants)**

---

[9] In one section of his complaint, Plaintiff describes UNC-CH's "school of social work climate from 2020 forward." (Compl. (Doc. 4) at 11.) Plaintiff alleges facts about the <u>racial</u> justice climate on UNC-CH's campus, as well as UNC-CH's formation of a "Racial Reconciliation Committee, whose charges included creating a forum where faculty, staff, and students could raise concerns of discrimination." (<u>Id.</u> ¶¶ 61-74.) Elsewhere in his complaint, Plaintiff alleges that "[c]ircumstances suggest that Defendant UNC-CH adopted PPDHRM in an effort to lower the protections for males accused of sexual misconduct . . . ." (<u>Id.</u> ¶ 383.)

The Fourth Circuit instructs that a plaintiff's allegations about external pressures on a university can be "relevant" to a Title IX claim but cautions that the plaintiff must "connect these generalized pressures to <u>his</u> case in a way that creates a reasonable inference [of] anti-male bias." <u>Kashdan v. George Mason Univ.</u>, 70 F.4th 694, 701 (4th Cir. 2023) (emphasis added). Neither Plaintiff's allegations regarding the racial justice climate nor UNC-CH's adoption of the PPDHRM are tethered to <u>his</u> case and thus do not create a reasonable inference that he experienced anti-male bias.

Case 1:24-cv-00233-WO-JLW   Document 30   Filed 06/30/25   Page 26 of 45

Next, Plaintiff brings a due process claim against all Defendants pursuant to 42 U.S.C. § 1983,[10] alleging that Defendants "failed to afford Plaintiff the minimum procedural safeguards required by due process, before discharge," which "resulted in the improper discharge of the Plaintiff." (Compl. (Doc. 4) ¶¶ 397, 414). Plaintiff seeks "prospective relief" and "compensatory and punitive damages." (Id. ¶¶ 417–18).

### 1. Due Process Claim against UNC Defendants

UNC and its constituent institutions are entitled to the protections of sovereign immunity guaranteed to the state of North Carolina by the Eleventh Amendment. See Huang v. Bd. of Governors of the Univ. of N. Carolina, 902 F.2d 1134, 1139 (4th Cir. 1990). Accordingly, the university as well as "the employee defendants sued in their official capacities are protected from a damages action by the same immunity." Doe v. Univ. of N. Carolina Sys., 133 F.4th 305, 318 (4th Cir. 2025) (internal quotation marks and citation omitted). A limited exception to state sovereign immunity exists in the Ex parte Young doctrine,

---

[10] 42 U.S.C. § 1983 provides that "[e]very person, who under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

- 27 -

which "allows suits against state officers for prospective equitable relief from ongoing violations of federal law." Id. (citation omitted).

Plaintiff has sued several UNC-CH officers in their official capacities, including Chancellor Lee H. Roberts, and seeks "prospective relief" for "the injury, damage, and loss" that he "continues to suffer." (Compl. (Doc. 4) at 1; id. at ¶¶ 416–17.) However, his complaint does not meaningfully expand on what type of "prospective relief" he seeks, and his briefing advances no argument that the due process violation he alleges is "an ongoing violation" in the context of the Ex parte Young doctrine. See Univ. of N. Carolina Sys, 133 F.4th at 318; (see generally Pl.'s Resp. to UNC Defs. (Doc. 23)). Rather, Plaintiff concedes that his "42 USC § 1983 Claim Against the UNC Defendants Should be Dismissed." (Pl.'s Resp. to UNC Defs. (Doc. 23) at 14.)

Having abandoned his § 1983 due process claim against the UNC Defendants, Plaintiff's claim will be dismissed against the

UNC Defendants as well as against the UNC-CH employees sued in their official capacities.[11]

## 2. **Due Process Claim Against Individual Defendants**

Plaintiff argues that his § 1983 due process claim should survive against the Individual Defendants in their individual capacities. (Pl's Resp. to Individual Defs. (Doc. 24) at 12-14.) "To plead a viable [Due Process] claim . . . [Plaintiff] must allege: (1) that he had a constitutionally cognizable life, liberty, or property interest; (2) that he was deprived of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." Doe v. Va. Polytechnic Inst. & State Univ., 77 F.4th 231, 236 (4th Cir. 2023) (internal quotation marks and citation omitted). The Individual Defendants argue that Plaintiff has not plausibly alleged a constitutionally cognizable interest (Element 1), and that even if he has, he has not plausibly alleged that the procedures employed by the Individual Defendants were constitutionally inadequate (Element 3). (Individual Defs.' Br. (Doc. 16) at 15-19.) The Individual Defendants additionally

_____

[11] As discussed infra Section IV.C.2., Plaintiff has likewise failed to plausibly allege (1) that he was deprived of a constitutionally cognizable interest and (2) that the process he received was constitutionally deficient. Accordingly, because he has failed to plausibly allege a due process violation, even if Plaintiff had not abandoned this claim against the UNC Defendants, he would not be entitled to Ex parte Young relief.

- 29 -

argue that they are protected by qualified immunity.[12] (Id. at 19-21.)

This court agrees. For each of the reasons argued by the Individual Defendants, Plaintiff's due process claim must be dismissed.

### i. **Property Interest**

Plaintiff contends that he has plausibly alleged a constitutionally cognizable property interest "in continued employment" at UNC-CH. (Pl's Resp. to Individual Defs. (Doc. 24) at 13.) The Supreme Court instructs that for an employee to possess a property interest in his continued employment, he "clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972).

This court looks to state law to determine whether Plaintiff has a legitimate claim of entitlement to his employment at UNC-CH. See Knight v. Vernon, 214 F.3d 544, 553 (4th Cir. 2000). "North Carolina is an at-will employment

---

[12] Qualified immunity "shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Univ. of N. Carolina Sys., 133 F.4th at 315 (internal quotation marks and citations omitted).

state," id., meaning that the employment relationship "is presumed to be terminable at the will of either party without regard to the quality of performance of either party," absent a delineated exception, such as one created by statute. See Kurtzman v. Applied Analytical Indus., Inc., 347 N.C. 329, 331, 493 S.E.2d 420, 422 (1997), reh'g denied, 347 N.C. 586, 502 S.E.2d 594 (1998).

In his complaint, Plaintiff alleges that his position at UNC-CH "was designated as permanent Exempt from the North Carolina Human Resources Act (EHRA) Non-Faculty Research Staff." (Compl. (Doc. 4) ¶ 28.) The North Carolina Human Resources Act provides for-cause discharge protection to career State employees covered by the Act, see N.C. Gen. Stat. § 126-35(a), but as Plaintiff alleges, his position was expressly exempt from the Act. Nowhere does Plaintiff allege that his position at UNC-CH was entitled to for-cause discharge protection, (see generally Compl. (Doc. 4)).

In his response to Defendants' motion to dismiss, Plaintiff asserts, without citing to the record, that "the UNC-CH Policies and Procedures that governed his termination . . . entitled him to termination 'for cause' and beyond at-will." (Pl's Resp. to Individual Defs. (Doc. 24) at 13.) Plaintiff's assertion appears to be founded on his allegation that, after the EOC concluded

- 31 -

its investigation, Holmes emailed Plaintiff "indicating that he was initiating a process to discharge Wretman from his employment at UNC-CH <u>for</u> <u>cause</u> based on the EOC Investigation Report and the finding that Wretman violated the UNC-CH Retaliation policy." (Compl. (Doc. 4) ¶ 273 (emphasis added).) Plaintiff alleges that his discharge proceeding was governed by UNC-CH's PPDHRM policies, (<u>id.</u> ¶¶ 280, 286-94), and that these "policies created a property right in Plaintiff's continued employment with the University," (<u>id.</u> ¶¶ 401-403). However, "in North Carolina 'an employer's personnel manual or policies are not part of an employee's contract of employment unless expressly included in that contract.'" <u>Knight</u>, 214 F.3d at 553 (citation omitted). Plaintiff has not alleged in his complaint that the UNC-CH PPDHRM and related policies are expressly included in his employment contract with UNC-CH. (<u>See</u> <u>generally</u> Compl. (Doc. 4); <u>see</u> <u>also</u> <u>id.</u> ¶¶ 383, 401.) Thus, he has not plausibly alleged that he possesses a constitutionally cognizable property interest in his continued employment by way of UNC-CH's PPDHRM and related policies.[13] Cf. <u>Knight</u>, 214 F.3d

---

[13] Defendants explain: "Plaintiff was an at-will employee. While he was separated for cause, he was not <u>entitled</u> to separation for cause; he could have been separated at-will. The mere possibility of a for-cause separation does not by itself create a property interest because an at-will separation was always permitted." (Individual Defs.' Br. (Doc. 16) at 17 (citations omitted).)

at 553 (finding no property interest at summary judgment where a county employee did not contend that the county's employee handbook, which contained grievance procedures, "was expressly incorporated into any employment contract").

### ii. <u>Liberty Interest</u>

Plaintiff additionally contends that he "has a constitutionally protected liberty interest in his [r]eputation." (Pl's Resp. to Individual Defs. (Doc. 24) at 13.) Specifically, he alleges that he possesses a liberty interest "because the allegations brought against [him] ultimately resulted in a discharge from University of North Carolina at Chapel Hill, a sanction that will have significant and lifelong ramifications with respect to his education, employment, and reputation." (Compl. (Doc. 4) ¶ 404.) He alleges that his discharge was "wrongful[]"and that it "will remain a part of [his] permanent record . . . [and] will impair his ability to seek further employment." (<u>Id.</u> ¶ 406.)

The Fourth Circuit instructs:

> Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, the due process requirements of notice and opportunity to be heard are essential. Accordingly, as to public employees, a Fourteenth Amendment liberty interest is implicated by public announcement of reasons for an employee's discharge.

- 33 -

Cannon v. Vill. of Bald Head Island, N. Carolina, 891 F.3d 489, 501 (4th Cir. 2018) (cleaned up). "To state this type of liberty interest claim under the Due Process Clause, a plaintiff must allege that the charges against him: (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false." Sciolino v. City of Newport News, Va., 480 F.3d 642, 646 (4th Cir. 2007). Even assuming without deciding that Plaintiff has alleged facts sufficient to satisfy the first, third, and fourth elements, he has not plausibly alleged that the charges against him "were made public" by UNC-CH. See id.

To satisfy this element, absent allegations that the employer has already made the charges public,[14] "an employee must allege (and ultimately prove) a likelihood that prospective employers (i.e., employers to whom he will apply) or the public at large will inspect the [stigmatizing] file." Id. at 650.

---

[14] For example, in Cannon, a suit brought by discharged Public Safety Officers against their former employer, the employer "made public the charges against the Officers in several ways, including by sending the Officers' termination letters to the news media and sending the email to all full-time Bald Head employees and part-time Department personnel stating that the Officers were terminated for 'harassment,' 'sexual harassment,' and 'detrimental personal conduct.'" See Cannon, 891 F.3d at 503. Here, Plaintiff does not allege that UNC-CH has already made public the charges associated with his discharge. Rather, he alleges the charges will "remain a part of [his] permanent record," (Compl. (Doc. 4) ¶ 406), and therefore could be made public in the future.

- 34 -

> A plaintiff can meet this standard in two ways. First, the employee could allege (and ultimately prove) that his former employer has a practice of releasing personnel files to all inquiring employers. Second, the employee could allege that although his former employer releases personnel files only to certain inquiring employers, that he intends to apply to at least one of these employers. In either case, he must allege that the prospective employer is likely to request the file from his former employer.

Id. (footnote omitted). By contrast, it is not enough for a plaintiff to merely allege "that his file with the charges 'may be available to prospective employers.'" Id.

Here, Plaintiff has alleged that his "discharge will remain a part of [his] permanent record" and "[a]bsent the relief sought through this matter, other individuals will inevitably come to learn of [his] wrongful discharge." (Compl. (Doc. 4) ¶ 406.) However, Plaintiff does not allege (1) that UNC-CH "has a practice of releasing personnel files to all inquiring employers" or (2) that UNC-CH "releases personnel files only to certain inquiring employers" and that "he intends to apply to at least one of these employers." See Sciolino, 480 F.3d at 650. Rather, Plaintiff offers only speculation that "other individuals will inevitably come to learn of [his] wrongful discharge," which, under the standard set forth by the Fourth Circuit in Sciolino, is insufficient to satisfy the requirement that the charge against him was made public by his employer and thus Plaintiff has failed to plausibly allege a liberty

- 35 -

interest. See id.; see also Strickland v. United States, 32
F.4th 311, 354 (4th Cir. 2022) (holding that a plaintiff failed
to plausibly allege a liberty interest where her complaint
relied only on speculation that her former employer disseminated
her file to a prospective employer).

### iii. **Process Received**

Finally, even if Plaintiff had plausibly alleged a
constitutionally cognizable property or liberty interest, he has
not plausibly alleged that the process he was afforded by UNC-CH
fell short of that required by the Fourteenth Amendment to
protect those interests. "The essence of due process is the
requirement that 'a person in jeopardy of serious loss [be
given] notice of the case against him and opportunity to meet
it.'" Todman v. Mayor & City Council of Baltimore, 104 F.4th

479, 488 (4th Cir. 2024) (quoting <u>Mathews v. Eldridge</u>, 424 U.S. 319, 348 (1976)).[15]

### Process Required for Property Interest

When an employee possesses "a constitutionally protected property interest in his employment," the Supreme Court instructs that "some kind of a hearing" is required "prior to the discharge of [that] employee." <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 542 (1985). That employee "is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." <u>Id.</u> at 546.

---

[15] Plaintiff summarizes his alleged due process violations as "including but not limited to" the following: (a) he received "[i]nsufficient notice of the allegations against him"; (b) he was "never able to cross-examine any of his accusers"; and (c) "[t]he investigators . . . refused to interview witnesses provided to them by Plaintiff." (Compl. (Doc. 4) ¶ 408.) Plaintiff does not expound upon these allegations in his brief or cite case law to support his position. (<u>See</u> Pl's Resp. to Individual Defs. (Doc. 24) at 13.) Plaintiff's allegation of "insufficient notice" is a conclusion not supported by the well-pleaded facts of his complaint. <u>See generally supra</u> Sections I.C., I.E. As for his allegations about cross-examination and interviewing witnesses, he cites no caselaw supporting the idea that he, as a university employee, had a clearly established right to cross-examine accusers or demand interviews of specific witnesses at the time of his disciplinary proceedings, nor has this court been able to identify any. Accordingly, with respect to a claim for damages, the Individual Defendants are protected by qualified immunity, <u>see supra</u> n.12, even if Plaintiff had plausibly alleged the other elements of his due process claim.

Applying Loudermill, the Fourth Circuit instructs:

> "[W]hen posttermination administrative procedures are afforded, . . . pretermination procedure functions only as 'an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.'" [Linton v. Frederick Cnty. Bd. of Comm'rs,] 964 F.2d [1436,] 1439 [(4th Cir. 1992)] (quoting Loudermill, 470 U.S. at 545-46, 105 S.Ct. at 1495). Such a hearing "need not be elaborate" and "need not definitively resolve the propriety of the discharge." Buschi[ v. Kirven], 775 F.2d [1240,] 1255 [(4th Cir. 1985)] (phone call offering an interview sufficient even though not accepted by employees). Therefore, a pretermination opportunity to respond, coupled with posttermination administrative procedures provides "all the process that is due." Loudermill, 470 U.S. at 547-48, 105 S.Ct. at 1496. To require more "would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." Id. at 546, 105 S.Ct. at 1495.

Holland v. Rimmer, 25 F.3d 1251, 1258 (4th Cir. 1994).

Here, Plaintiff was afforded posttermination administrative procedures. That is, after discharge, he was afforded opportunity to (1) file a written grievance, (Compl. (Doc. 4) ¶¶ 297-305), (2) attend a four-hour hearing and spend 90 minutes presenting his side of the case, (id. ¶¶ 306-28), (3) submit an appeal to the UNC-CH Chancellor, (id. ¶¶ 329-39), and (4) submit a second appeal to the UNC-CH Board of Trustees, (id. ¶¶ 340-52).[16] Because Plaintiff was afforded posttermination administrative procedures, he was entitled to pretermination

---

[16] Plaintiff also had the right to petition for judicial review of UNC-CH's decision. See supra Section IV.A.

procedure functioning only as "an initial check against mistaken decisions." See Holland, 25 F.3d at 1258 (citations omitted). His pretermination procedure "need[ed] not be elaborate," "need[ed] not definitively resolve the propriety of the discharge," and needed only provide an "opportunity to respond." Id.

Plaintiff received pretermination procedure sufficient to satisfy these requirements. In summary, Plaintiff received (1) NOIs alerting him to each of the charges levied against him (including notification of the retaliation charge for which he was ultimately found responsible), (2) an interview with EOC investigators, (3) notification of the Outcome Team's findings, and (4) the opportunity to attend a "Pre-Discharge Conference," during which Plaintiff answered questions related to the retaliation determination. See supra Sections I.B.-I.E. Accordingly, even if Plaintiff had plausibly alleged a constitutionally cognizable property interest in his continued employment, he has failed to plausibly allege that he was denied due process. See Holland, 25 F.3d at 1258.

### Process Required for Liberty Interest

Regarding a liberty interest, "when a governmental employer places an employee's reputation at stake by publicly disclosing defamatory charges, the employee is entitled to a hearing to

clear [his] name against [the] unfounded charges." Cannon, 891
F.3d at 505 (internal quotation marks and citation omitted); see
also Codd v. Velger, 429 U.S. 624, 627-28 (1977). This name-
clearing hearing "must be granted at a meaningful time," which
means sometime before the employee's name "has been ruined by
dissemination of false, stigmatizing charges." Sciolino, 480
F.3d at 653. "In situations like that at hand, the
constitutional harm is not the defamation itself; rather it is
the denial of a hearing at which the dismissed employee has an
opportunity to refute the public charge." Id. at 649 (internal
quotation marks and citation omitted).

As explained above, Plaintiff has not alleged any past
disseminations of his EOC charges by UNC-CH, nor has he alleged
that his personnel files are likely to be disseminated by UNC-CH
in the future. See supra Section IV.C.2.ii. And even if he had
plausibly alleged that UNC-CH has a practice of releasing
personnel files to inquiring employers, making it likely that
his files will be disseminated in the future, see Sciolino, 480
F.3d at 650, UNC-CH provided Plaintiff a four-hour name-clearing
hearing during his appeals process, (Compl. (Doc. 4) ¶¶ 311-19),
which afforded him fair opportunity to refute his discharge
prior to any future dissemination to a prospective employer, see
Sciolino, 480 F.3d at 649-50. "'Due process obviously does not

require more than a fair opportunity' even if the former employee's efforts to refute and clear his name are ultimately unsuccessful." See Harrell v. City of Gastonia, 392 F. App'x 197, 203 (4th Cir. 2010) (quoting Boston v. Webb, 783 F.2d 1163, 1166 (4th Cir. 1986)).

As discussed throughout this section, see Section IV.C., Plaintiff has not plausibly alleged a constitutionally cognizable property or liberty interest, and even if he had, he has not plausibly alleged that he was denied constitutionally adequate process. Finally, throughout his complaint, Plaintiff asserts a number of other grievances about UNC-CH's investigation, the credibility of its findings, and the logic of its decision to discharge him. But in those grievances, he has not plausibly alleged a violation of the Due Process Clause of the Fourteenth Amendment. As the Supreme Court instructs:

> The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error. In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume that official action was regular and, if erroneous, can best be corrected in other ways. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.

<u>Bishop v. Wood</u>, 426 U.S. 341, 349-50 (1976) (footnote omitted).

The Individual Defendants' motion will be granted, and Plaintiff's Fourteenth Amendment due process claim will be dismissed.

### D. **State Law Claims**

Plaintiff also brings state law claims for breach of contract, (Compl. (Doc. 4) at 70), negligent hiring, supervision, and retention, (<u>id.</u> at 73), negligent infliction of emotional distress, (<u>id.</u> at 75), intentional infliction of emotional distress, (<u>id.</u> at 77), violation of the state constitution, (<u>id.</u> at 78), civil conspiracy, (<u>id.</u> at 80), and punitive damages, (<u>id.</u>).

After the removal of this case, (<u>see</u> Notice of Removal (Doc. 1)), these claims are before this court pursuant to supplemental jurisdiction, as they arose from the same "case or controversy" as Plaintiff's Title IX and § 1983 claims, <u>see</u> 28 U.S.C. § 1367(a), and "derive from a common nucleus of operative fact," <u>see</u> <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 725 (1966).

"The district courts may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c).

> Ordinarily, when the federal claims are dismissed before
> trial, even though not insubstantial in a jurisdictional
> sense, the state claims should be dismissed [without
> prejudice] as well. However, when an action has been
> removed from state court and the district court
> subsequently loses its basis for original jurisdiction,
> in most instances the action must be remanded to the
> state court.

Darcangelo v. Verizon Commc'ns, Inc., 292 F.3d 181, 196 (4th Cir. 2002) (internal quotation marks and citations omitted) (instructing the district court to "consider the propriety of continuing to exercise its supplemental jurisdiction" after plaintiff's federal claim was dismissed and "only state law claims remain").

This court has dismissed Plaintiff's federal claims and, after considering factors such as judicial economy, convenience, fairness, and comity, it now declines to exercise supplemental jurisdiction. See Henderson v. Harmon, 102 F.4th 242, 251 (4th Cir. 2024). Especially in light of the parties' arguments as to the exhaustion of administrative remedies, see supra Section IV.A., which involves the interpretation of state statutes and possibly a discretionary determination of whether Plaintiff can show "good cause" to file a late petition for judicial review, see N.C. Gen. Stat. § 150B-45(a), this court finds the comity factor particularly persuasive. Accordingly, Plaintiff's state law claims will be remanded to Orange County Superior Court.

- 43 -

## V.    CONCLUSION

The UNC Defendants' Motion to Dismiss, (Doc. 13), and the Individual Defendants' Motion to Dismiss, (Doc. 15), are both granted in part. Plaintiff has failed to state a plausible claim for relief as to his Title IX claim, asserted against the UNC Defendants, as well as to his § 1983 due process claim, asserted against both the UNC Defendants and the Individual Defendants. Those claims are dismissed with prejudice.

As this court has granted Defendants' motions to dismiss Plaintiff's two federal law claims, it declines to exercise supplemental jurisdiction over Plaintiff's state law claims. Those claims will be remanded to state court.

For the foregoing reasons,

**IT IS THEREFORE ORDERED** that UNC Defendants' Motion to Dismiss, (Doc. 13), is **GRANTED IN PART** as to Plaintiff's federal claims asserted under Title IX and § 1983. These federal claims are **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that Individual Defendants' Motion to Dismiss, (Doc. 15), is **GRANTED IN PART** as to Plaintiff's federal claim asserted under § 1983. This federal claim is **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** the UNC Defendants' motion, (Doc. 13), and the Individual Defendants' motion, (Doc. 15), are

- 44 -

**DENIED IN PART** as to Plaintiff's state law claims. These state law claims are **REMANDED** to the Orange County Superior Court in the State of North Carolina.

A judgment dismissing Plaintiff's federal claims and remanding all remaining state law claims to state court is filed contemporaneously herewith.

This the 30th day of June, 2025.

_____
United States District Judge

Case 1:24-cv-00233-WO-JLW    Document 30    Filed 06/30/25    Page 45 of 45